ARMSTRONG WORLD INDUSTRIES, INC. AND AFFILIATED COMPANIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Armstrong World Industries, Inc. v. Commissioner
Docket No. 853-89
United States Tax Court
T.C. Memo 1991-326; 1991 Tax Ct. Memo LEXIS 375; 62 T.C.M. (CCH) 148; T.C.M. (RIA) 91326; July 16, 1991, Filed *375 Decision will be entered under Rule 155. A. Carl Kaseman, III, Stephen R. Mysliwiec, and James G. Rafferty, for the petitioner. Eugene J. Wien and Judy Jacobs Miller, for the respondent. COHEN, Judge. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency of $ 5,032,135 in petitioner's Federal income tax for 1981. The issues for decision are (1) whether petitioner's transactions with Conrail complied with the requirements of section 168(f)(8) with respect to safe harbor leasing, thus entitling petitioner to certain investment tax credits and depreciation deductions for the leased property, and (2) whether petitioner is entitled to use the Replacement-Retirement-Betterment 1-year recovery period for property placed in service in 1981. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Armstrong World Industries, Inc. (petitioner), was *376 incorporated under the laws of the Commonwealth of Pennsylvania, with its principal office located in Lancaster, Pennsylvania. In 1981, petitioner used the accrual method of accounting and a calendar year basis for Federal income tax and financial accounting purposes. During 1981, petitioner was taxed under subchapter C of the Internal Revenue Code and was not a personal holding company under section 542. For 1981, petitioner filed a consolidated corporate Federal income tax return. The Consolidated Rail Corporation (Conrail) was incorporated in 1974 and began operations in 1976 primarily to receive and to operate railroad properties belonging to six insolvent railroads. Conrail was at all relevant times taxed under subchapter C of the Internal Revenue Code. Conrail sustained substantial net operating losses from its inception through 1981. Conrail was a common carrier railroad operating in interstate commerce and was required to maintain its books and records according to the Interstate Commerce Commission (ICC) Uniform System of Accounts prescribed for class 1 rail carriers. Conrail used the accrual method of accounting for financial reporting, ICC reporting, and Federal *377 income tax reporting purposes. The Safe Harbor Leasing Transactions Between Petitioner and Conrail
Conrail solicited formal bids, through investment bankers and others, for the sale and leaseback of the property that is the subject of the safe harbor leasing transactions in issue. Petitioner was the highest bidder. Petitioner and Conrail entered into nine agreements for the sale and leaseback of railroad property with a total basis of approximately $ 96 million. In each agreement, the parties elected to have the provisions of section 168(f)(8) apply. Three of the agreements were dated "as of December 17, 1981," and six of the agreements were dated "as of December 31, 1981." Of the nine agreement documents entered into between Conrail and Armstrong for the sale and leaseback of numerous properties, three agreements related to replacement and betterment to track structure, three related to additions and improvements (A&I), and three related to equipment reconstruction costs. Each of the three A&I agreements entered into between Conrail and Armstrong that pertain to the properties in dispute defined "Item of Property" as "each of the items of property described in Exhibit *378 A hereto." Exhibit A of the agreement "dated as of December 17, 1981," for $ 14,512,260 defined "Item of Property" as "All of the Additions and Improvements in respect of the Property described in the Supplement to this Exhibit A, and the supporting documents thereto, placed in service between October 1, 1981 and October 31, 1981, both inclusive." Exhibit A of the agreement "dated as of December 31, 1981," for $ 3,053,144, defined "Item of Property" as "All of the Additions and Improvements in respect of the Property described in the Supplement to this Exhibit A, and the supporting documents thereto, placed in service between November 1, 1981 and November 31, 1981, both inclusive." Exhibit A of the agreement "dated as of December 31, 1981," for $ 16,500,000, defined "Item of Property" as "All of the Additions and Improvements in respect of the Property described in the Supplement to this Exhibit A, and the supporting documents thereto, placed in service between November 1, 1981 and December 31, 1981, both inclusive." Schedules and supplements identifying the accounts and properties comprising the agreed dollar amounts for the leased properties were prepared. The Supplement to exhibit *379 A for the three A&I agreements described the leased properties only by authority for expenditure (AFE) numbers and did not show any breakdown of the component properties included in each AFE number. Those schedules and supplements were not physically attached to the leases. The Supplement to exhibit A of the agreement "dated as of December 31, 1981" for $ 16,500,000 was not completed by Conrail or provided to Armstrong until, at the earliest, January 19, 1982, when supporting documents were prepared. On December 17, 1981, and December 31, 1981, petitioner, by wire transfer, made payments to Conrail in the respective amounts of $ 19,006,523.86 and $ 15,738,726.14. Under the terms of the agreements, petitioner agreed to make deemed, semi-annual payments of principal and interest, and Conrail agreed to make deemed rental payments to petitioner in the same amounts. Under the agreements, no money actually changed hands with respect to the deemed rental or deemed principal and interest payments. Petitioner and Conrail timely filed Forms 6793, "Safe Harbor Lease Information Return," with respect to the properties that were the subject of the agreements. On those forms, the safe harbor *380 lease properties were described as "additions and improvements" or "replacements and betterments to track structure." The subject properties were not specifically identified on those forms. The Orrville-to-Colsan Traffic Control System
In the late 1970s, Conrail experienced considerable congestion and delays in the movement of traffic on the Pittsburgh-to-Chicago main rail line between Orrville and Colsan, Ohio. The main rail line from Orrville to Colsan consisted of two parallel tracks, extending 76 miles, each able to operate trains in only one direction. The delays were caused by the heavy volume of traffic and by the outmoded system of controlling train traffic along that route. During that time, the various interlockings (connections between main tracks and sidings) along the route were controlled by human operators stationed in control towers. An operator was required to be in the control tower at all times to watch for oncoming trains, to flash the appropriate signals to the trains, and to manipulate the track at the interlocking to ensure that each train was routed onto the appropriate main track or siding. After passage of a train, the operator would normally *381 signal towers further down the track that a train would be approaching their location. An equipment housing near the signals contained batteries and electrical relays that transmitted commands from the tower operator to the signal equipment and track routing equipment. The instructions as to how to align a track for each train were given to each operator verbally by a human dispatcher at a distant location. On April 12, 1977, to eliminate the delays on the main line, the Board of Directors of Conrail approved the Orrville-to-Colsan Traffic Control System. One or more AFE numbers were assigned to a project by Conrail's accounting department in order to monitor costs. The Orrville-to-Colsan project was described on an AFE form used by Conrail and dated October 27, 1977, as follows: (1) Install a traffic control signaling system (TCS) on the Pittsburgh-Chicago main line between Orrville and Colsan, Ohio, and on the Cleveland-Indianapolis main line between Crestline and Galion, Ohio; (2) downgrade the parallel Akron-Galion main line; (3) convert to remote control 17 interlockings; (4) improve connections at Crestline, Ohio, from the Pittsburgh-Chicago main line to the Cleveland-Indianapolis *382 main line; and (5) construct a connection at Mansfield, Ohio, from the Pittsburgh-Chicago main line to the Brady Lake-Galion main line. The AFE form included AFE Nos. HC94, HC95, HC96, HC97, HC98, and HC99, totaling $ 11,469,000. Gross investment cost as used on an AFE was a prospective estimate of all expenditures to be incurred under the AFE, including removal costs, used (fit) material costs, and costs of non-section 38 property. The gross investment costs contemplated by a revised AFE form dated June 6, 1980, categorized by each AFE number, were as follows: AFE Number
Description of Work
Gross Investment Cost
HC94
TCS on Pitts.-Chic. line
$ 10,015,000
HC95
TCS Crestline-Galion
MP 75.5-79.0
790,000
HC98
TCS Crestline-Galion
MP 75.5-79.0
111,000
HC97
TCS Crestline-Galion
655,000
HC96
TCS Akron-Galion
1,307,000
HC99
TCS Crestline-Galion
Columbus Office Machine
22,000
TOTAL   $ 12,900,000
The installation of the TCS served to permit two-way movement of trains on each of the parallel tracks. The TCS was constructed in segments. In the construction process, the extent of a given segment or segments would be determined and construction would proceed on such *383 segment or segments. When new signals, connections to Youngstown, Ohio, wiring, and necessary track work were completed in a segment, such segment would be "cut over," i.e., turned over by construction personnel to local crews for actual train operation. The trains and track switches on the completed segment were operated by remote control by the dispatcher at Youngstown. As each additional geographic segment was completed, it would be connected permanently to previously completed segments, temporary wiring to unreconstructed segments would be installed, and the newly completed segment would also be controlled from Youngstown. The following is the schedule of actual cutover dates on which each geographic segment was turned over to local train crews for actual train operations: 1. Lucas & Ross
3/7/79
2. Mans. & W. Mans.
11/15/79
3. Horn
12/4/79
4. E. Crest
3/13/79
5. W. Yard
9/10/80
6. E. Colsan
9/8/80
7. Colsan
9/8/80
8. Mohican
10/21/80
9. Big Run
5/21/81
10.
Crest. & W. Crest.
5/27/81
11.
Orrville
10/26/81
A computer was installed at Youngstown to govern the entire Orrville-to-Colsan TCS. The computer was able to throw switches, change signals *384 by remote control, and perform the decision-making process for train routing and prioritizing of trains. The computer was installed in 1980. The final TCS segment was cut over on October 26, 1981. Until the final TCS was cut over, the computer was not able to make prioritizing decisions along the entire route. The Orrville-to-Colsan project involved, in addition to the installation of a TCS, various track changes at each interlocking along the route to permit higher speed movements and certain other changes, such as adding a siding so that low-priority trains could be held to one side to allow priority traffic to pass. Rail Classification Yards
The function of a rail classification yard is to receive incoming trains, to re-sort the cars of the incoming trains into new outgoing trains, and to send the new trains out of the yard. In a rail classification yard, among other things, (1) incoming trains are disassembled, (2) cars are sorted by destination, and (3) cars are reassembled into new trains. A rail yard typically is found near the intersection of two or more major rail lines. In physical terms, a rail yard usually includes receiving tracks for incoming trains, classification *385 tracks, and departure tracks. Trains entering a rail yard from any of the lines served by the yard are first routed to the receiving tracks, on which trains are lined up for uncoupling and sorting. In a hump yard, this sorting function is performed when a yard engine pushes a train up to the crest of the hump, a man-made hill. Cars are uncoupled at the crest and then descend into the classification yard, where they automatically are switched onto the appropriate track to meet and couple with previously sorted cars. As each car descends, it is braked automatically by retarders built into the track. Groups of outbound cars are then taken to the departure yard for assembly into new trains before leaving the yard. Cars released by the retarders at a speed that is too fast or too slow can disrupt significantly the safe and efficient functioning of a rail classification yard. Cars that travel too fast cause hard couplings and can cause derailments and damage to the cars and lading. Cars traveling too slowly may stall, i.e., not clear the switches into the receiving track, thereby obstructing further sorting activities on its own track and other tracks. The automation of switches *386 in a railroad yard with a retarder control system increases the efficiency of the yard by eliminating the need for an operator to disrupt train movement in order to throw the retarder switch. Allentown Yard
Prior to 1978, Conrail had two separate yards at Allentown, Pennsylvania. An eastbound yard was located on the northern side of the tracks with a self-contained set of receiving, classification, and departure tracks designed to serve only eastbound traffic. A westbound yard contained a similar but separate set of tracks to serve only westbound traffic. Those yards were in a deteriorated condition, and their configuration was not suited to the altered traffic volume and movements faced by Conrail. On June 13, 1978, the Board of Directors of Conrail approved a request for investment authority (RIA) No. 1978-24, and thereafter in 1978, the Board of Directors also approved an AFE form including AFE Nos. HN07 and HN08, totaling $ 13,051,000, to "remove the Eastbound yard, level the hump, then construct a new receiving and departure yard, with main tracks relocated around the south side of the yard. The Westbound classification yard is to be expanded with a new retarder *387 and 8-track group on the south side." The anticipated gross investment costs identified under each AFE number were as follows: AFE
Description of Work
Gross Investment Cost
HN07
Allentown yard improvements
$ 13,000,200
HN08
Allentown yard improvements
50,800
Total   $ 13,051,000
An automatic switching feature was installed by SAB Harmon Industries, Inc. (Harmon), in September 1980. The first test of the full system, i.e., the automatic switching feature and the speed control feature, was performed in January 1981. There were several ongoing problems with both the automatic switching portion and the speed control portion of the system. Those problems were brought to the attention of Harmon representatives. Harmon took corrective action to resolve the problems with the system. The last changes with respect to the software and hardware relating to the system were made in November 1981. In November 1981, Harmon personnel went to Allentown to make two changes to the system. One change was made to enable the relays to operate fewer times thereby making the retarders close fewer times. The second change was made to compensate for the temperature so that, when the *388 weather was cold, the cars would be released a little faster and, when the weather was hot, the cars would be released a little slower. The changes made to the system in November 1981 were design changes. They were not in the original specifications for the system. Although the system experienced problems after Harmon's last visit in November 1981, the problems were in the nature of normal maintenance, i.e., component rather than system failures. The Allentown yard continued to operate during the course of construction, and portions of the yard were used both before and after they were involved in the construction work. The Oak Island Yard
Prior to the creation of Conrail, the northern New Jersey area surrounding the Oak Island yard was served by three separate railroads, each of which maintained its own classification yard. Upon the formation of Conrail and subsequent consolidation of service, it was no longer efficient to continue to operate all of the various yards. Accordingly, Conrail decided to consolidate the adjacent Garden and Oak Island yards into one yard, to close the other yards in the area, and to expand and modernize the new Oak Island yard. The benefits *389 of the project included having a single yard with the capacity and operating efficiency to handle the resulting increased traffic flow. On January 4, 1980, Conrail's Board of Directors approved an AFE form consisting of work identified by AFE Nos. TD25 through TD33 to improve the Oak Island yard. The AFE form identified anticipated gross investment costs of $ 10,687,443. The underlying RIA (No. 1978-36) was approved by Conrail's Board of Directors on September 12, 1978, and authorized an investment of $ 13.6 million. The Oak Island project was described as follows in the AFE form: 1. Track Connection at Nave
2. Buildings and Utilities. A New Main Yard Office is required, to house the general office, superintendent's office, field terminal, crew locker and welfare facilities, maintenance areas, and yardmaster's tower. Also to be constructed are an East Yard office and a caboose servicing facility. 3. Communications and Signal Facilities. These facilities include Route Selection control equipment; operating consoles; and talkback speakers. Also included are changes in signals and electric traction facilities associated with new track connections in the *390 terminal at "CY" and "PIKE." 4. Track Changes. This construction includes new connections and track changes required for consolidation in the Oak Island area. Included are: (a) crossovers at "Upper Bay"; (b) crossover in the Greenville Branch; (c) crossovers at "WA2;" (d) installation of setoff track; (e) track changes at east (pullout) end of Oak Island; (f) track changes in the Westbound Receiving Yard and Garden Yard; (g) locomotive escape track. 5. Yard Retirements. Track and crossovers are listed to be retired at the following yards: Waverly, Bayline, Oak Island, Elizabethport, and Brills. The gross investment costs identified under AFE Nos. TD25 rough TD32 were broken down on the AFE form as follows: Gross Investment
AFE Number
Description of Work
Cost
TD25
Part A--Expansion and
Modification of Oak Island Yard
$ 1,875,522 TD2
Part A--Expansion and
Modification of Oak Island Yard
4,860,781
TD2
Part A--Expansion and
Modification of Oak Island Yard
182,134 Part A--Total
$ 6,918,437 TD28-31
Part B--Nave Connection
$ 3,238,810 TD32
Part C--Waverly Yard Retirements
$ 151,520   TD25
Part C--Bay Line Yard Retirements
108,160
TD26
Part C--Oak Island Yard Retirements
11,836
TD33
Part C--Elizabethport Yard
Retirements
173,520
TD27
Part C--Brills Yard Retirements
85,160
Part C--Total
$ 530,196   Parts A, B, & C--Total
$ 10,687,443
*391 AFE Nos. TD28 through TD31 covered construction of the connection at Nave. The function of the Nave connection was described in the AFE as follows: The present route for trains moving in the terminal area between Oak Island and Croxton yards requires two reverse movements plus travel over the highly congested P&H Branch, resulting in excessive yard crew and locomotive cost. It is proposed to build a track connection at control point "NAVE" in Jersey City, connecting the National Docks Branch and Croxton yard. This connection will establish a direct route between the Oak Island Classification and departure tracks at Croxton yard, completing the integration of all North Jersey Terminal yards into the Oak Island consolidation plan. An automatic retarder control and route selection system was installed at the hump at Oak Island that was nearly identical to the system that was installed at the Allentown yard. That system was designed and installed by Harmon in July 1981. After the system at Oak Island was installed, the system experienced numerous operational problems. As a result, various changes were made to the system. Many of those changes required Harmon personnel *392 to make various hardware and software modifications. Those changes were completed on September 10, 1981. The last changes made by Harmon to the system took place in November 1981. On that date, a change was made to the console module. That change was necessary to eliminate paper jams in the console typewriter or printer. The Oak Island yard continued to operate during the course of construction, and portions of that yard were used both before and after they were involved in the construction work. The Olean Yard and TCS
Olean, New York, is located in southwest New York in an area known as the southern tier. Olean is a heavily traveled north-south route of the former Penn Central railroad that crosses the former Erie-Lackawanna line. The old Olean yard was located on the north-south line, in the southwest quadrant of that crossing. In the late 1970s, New York was seeking to purchase the land occupied by the old Olean yard for use in building a highway. The State agreed to pay Conrail $ 3,506,000 for the land and for construction of a TCS. The agreement between Conrail and the State of New York provided the following with respect to title to the materials: The materials *393 used for the purpose of accomplishing the work set forth in the Wellsville Siding Work Schedule (Appendix 1A) and the Signal and Communications Work Schedule (Appendix 1B) shall be the property of the State and title thereto shall be vested in the State for the useful life of said materials. For the purposes of this Agreement, the useful life of the materials shall not exceed the term of this Agreement. At the end of the useful life of said materials, or at an earlier date as otherwise set forth in the Special Provisions of attached Appendix 3, title shall be vested in the Railroad.
The Wellsville siding project consisted of the installation of a passing siding and two automatic switches or control points at the entrances to the siding near Wellsville, New York. The siding was located approximately 22 miles east of the easternmost part of the TCS between Cuba Junction and Salamanca. Appendix 1 to the agreement between Conrail and the State of New York provided the following description of the work to be performed on the Olean-Wellsville project: This project consists of four parts, each to be funded in whole or in part, in different manners. All four parts are elements *394 of the project and must be accomplished, but only Parts 3 [relating to the construction of the Wellsville siding] and 4 [construction of the TCS between Cuba Junction and Salamanca] are funded by the State under this Agreement.
On June 20, 1979, the Board of Directors of Conrail approved RIA No. 1979-15, and on October 19, 1981, the Board also approved an AFE form for AFE Nos. TC08, TC09, TC10, TD53, TD51, and TE14, authorizing a gross investment of $ 11,144,500 to: (1) Construct a new yard at Olean; (2) construct new wye track in the northwest and southwest quadrants; and (3) remove one main track and install a TCS on the remaining track from Cuba Junction, New York, to Salamanca, New York. The trackage removed as part of the installation of the TCS on the east-west line was used to construct a new Olean yard. The anticipated gross investment costs identified under each AFE number were as follows: Gross Investment
AFE Number
Description of Work
Costs
TC08
Part A--Construct new yard
$ 6,172,400 TC08
Part B--Construct track
connection at X Tower
973,200
TC09
Part C--Construct new yard
1,004,800
TC09
Part D--Construct track
connection at X Tower
475,400
TC09
Part E--Remove 1 main track Cuba
Junction to Salamanca & TCS
2,002,400
TC10
Part E--Remove 1 main track Cuba
Junction to Salamanca & TCS
110,500
TD53
Part F--Salamanca yard--remove
tracks & turntables
144,300
TD51
Part G--Install & rearrange signal
equip. related to track connection
at X Tower
12,700
TE14
Part H--Install & rearrange signal
equip. in leased bldg. at Youngstown
related to TCS
141,700
TC08
Part I--Rearrange industry tracks
off RR right-of-way at X Tower
107,100
TOTAL   $ 11,144,500
*395 Prior to the time the project was initiated, trains that wanted to use the Olean yard, whether arriving from Buffalo or Williamsport or Harrisburg, had to stop and operate hand switches in order to get in and out of the yard. The automation of the switches was essential to the operation of the Olean yard. The new Olean yard was completed in 1982. The TCS from Cuba Junction to Olean was cut over on May 21, 1980. The West Olean-to-East Salamanca portion was cut over on April 8, 1981. The TCS from West Olean to Olean was cut over on December 17, 1981. The TCS work done after December 1981 involved the rearrangement and construction of Control Point West Cuba and the installation of the TCS from Control Point West Cuba to East Salamanca in the western-most segment of the system. The TCS from Cuba Junction to Salamanca was completed in March 1982. The construction and installation of the control point at Scio, New York, took place in 1982. Control Point Scio, however, was the control point at the western entrance of the Wellsville siding. The work at Control Point Scio did not affect the functioning of the Olean yard. Switch heaters, also known as snow melters, were installed *396 at the interlockings at East Salamanca and Control Point West Cuba and at Control Point Wellsville and Control Point Scio. Flashers at the crossings along the east-west line were relocated in 1982. There was also miscellaneous cleanup work done in 1982 with respect to the Olean project. Replacement Track Properties
On December 31, 1980, and at all prior times, Conrail used the Replacement-Retirement-Betterment (RRB) method of depreciation under section 167(r) for its track properties. Petitioner never used the RRB method of depreciation. Conrail used a system known as Depreciation Accounting for Track Structure (DATS) for recording the costs of programmed track rehabilitation. The DATS program track work consisted of a review of a certain portion of Conrail's track system each year to replace or rehabilitate old or worn materials. There were basically five types of planned projects or categories of work to be undertaken during any year: (1) Rail and surfacing or tie and surfacing categories; (2) tie only or bridge deck categories; (3) surface only category; (4) interlock category; and (5) rail, field weld, crossing diamond, or retarder categories. Each DATS job was *397 assigned a specific work order number. Charges for labor or material relating to that specific rehabilitation project flowed into Conrail's integrated accounting system by reference to the work order number. By using the work order number for the job, which might involve as little as a couple of thousand dollars of costs, Conrail was able to identify the particular work and materials involved in the job and its precise location. Individual time cards of Conrail employees performing the reconstruction work were coded to reflect the specific job involved. Materials used were charged out of Conrail's inventory using forms that were coded to reflect the job and to indicate whether the material was new or used. Conrail excluded costs attributable to used property from the RRB replacement property included under the leases. The track property installed by Conrail during the months of October, November, and December 1981 included $ 50,973,247 of RRB replacement property. Pursuant to three agreements, Conrail sold $ 50,973,247 of RRB replacement property to petitioner. The term of each of the agreements was 21 years without option or reservation for renewal. There were no extensions *398 of the agreements. At the time of the execution of the safe harbor lease agreements, Conrail had a cost basis of $ 50,973,247 in the RRB replacement property included under such lease agreements. For Federal income tax purposes, petitioner had a basis in this RRB replacement property of no greater than $ 50,973,247. Further, the replacement and betterment track properties transferred pursuant to the three agreements were considered placed in service by Conrail within 3 months prior to the agreement dates. Petitioner, as the lessor, used a 5-year recovery period for both the RRB replacement property and betterments installed by Conrail during October, November, and December 1981 and transferred pursuant to the three agreements. The class lives for the component properties that were constructed as part of the four A&I projects at issue and that were included under the lease documents were either 14 or 30 years. The lease term of the subject properties was no greater than 150 percent of the class lives. Railroad track properties and grading were the only component properties included under the lease documents that did not have assigned class lives. The useful economic life of *399 grading is 121 years. The useful economic life of track properties is no less than 24 years. The term of the Armstrong/Conrail lease documents was no greater than 90 percent of the useful economic lives of the track and grading properties included thereunder. At the time the properties were placed in service under the agreements and at all times thereafter, petitioner maintained an investment in each of the properties in an amount not less than 10 percent of the adjusted basis of such properties. Conrail used all of the properties included under the safe harbor lease agreements at issue in this case in its trade or business. Conrail's Records
Upon completion of a project, the project support division of Conrail prepared a completion report on Form CE-355. Those reports contained spaces for a brief description of the project and the dates on which a project was started, completed, and placed in service. Certain of those forms were altered, before being sent to the Internal Revenue Service or offered in evidence in Court, for purposes of placed-in-service dates with respect to the safe harbor leasing transactions between Conrail and petitioner. Placed-in-service dates *400 on certain of those forms were crossed out or whited out and replaced with other dates. An internal Conrail memorandum with respect to closing out the accounting costs on the Olean yard stated: It should be noted that the "Completion Report" dated October 13, 1981 was a "tentative" one, and was issued only at the request of the Accounting Department, in order for them to satisfy regulations governing their investment tax credit package. * * *
Another internal Conrail memorandum on the Olean yard improvement project stated: Based on our general handling of CE-355's, I can only say that this particular completion report was initiated to satisfy regulations governing tax benefit sales, as the capital work done on this project in 1982 was scheduled to be done in 1982 and is appropriately charged to capital.
The Forms CE-355 offered in evidence in this case were not reliable evidence of either Conrail's regular system of accounting or actual dates on which properties were placed in service. Notice of Deficiency
The depreciation deductions and investment tax credits disallowed by respondent relate to approximately $ 29,775,950 of additions and improvements *401 purchased by petitioner from Conrail and leased back to Conrail under three of the nine agreements. The notice of deficiency described the amounts in dispute as follows: Section 38
"As of" Date
Total Leased
At Issue
Property
12/17/81
$ 14,512,260
TC09 Olean
$ 2,730,980 HC94 Orrville-
10,086,334
Colsan 12/31/81
16,500,000
TC08 Olean
3,747,672
TD25 Oak Island
1,333,702
HN Allentown
8,976,313
12/31/81
3,053,144
TD26 Oak Island
2,900,944
Total at Issue
$ 29,775,945
In the Explanation of Items attached to the notice of deficiency, respondent stated: It is determined that you failed to establish that the depreciation deductions claimed on your return, with respect to certain purported sales/leasebacks of railroad properties between Conrail, and you, in the amount of $ 4,466,392.00, are deductible under the "safe harbor" lease provisions of Section 168 or are otherwise deductible under any other provision of the Internal Revenue Code. It is determined that you failed to establish that the investment tax credits claimed on your return, with respect to certain purported sales/leasebacks of railroad properties between Conrail, and you, in the *402 amount of $ 2,977,595.00, is allowable under any provision of the Internal Revenue Code.
On January 12, 1989, petitioner timely filed its petition in this case challenging the deficiency determined by respondent. In addition, petitioner claimed an overpayment of Federal income tax in an amount in excess of $ 20 million for 1981. That overpayment claim relates to depreciation deductions over a 5-year period with respect to $ 50,973,247 of replacement track properties purchased by petitioner from Conrail and leased back to Conrail under three of the nine agreements. OPINION Safe Harbor Leasing--Conceptually
The safe harbor leasing provisions were enacted in 1981 as part of the Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 172. The rationale for the enactment of the safe harbor leasing provisions, as stated by the Senate Finance Committee report, was as follows: The committee recognizes that some businesses may not be able to use completely the increased cost recovery allowances and the increased investment credits available for recovery property under ACRS [accelerated cost recovery system]. ACRS will provide the greatest benefit to the economy if ACRS *403 deductions and investment tax credits are more easily distributed throughout the corporate sector. Under present law, three-party financing leases ("leverage" leases) are now widely used to transfer tax benefits to users of property who do not have sufficient tax liability to absorb those benefits. The committee has decided to facilitate the transfer of ACRS benefits through these types of transactions. Under current administrative practice, however, lease characterization is subject to specific IRS guidelines. Moreover, court decisions have not prescribed clear guidelines as to the appropriate tax characterizations of financing leases. Since the committee has decided that lease characterization should be more available, the committee bill establishes an exception to current judicial and administrative guidelines dealing with leasing transactions. * * * The committee bill creates a safe harbor that guarantees that a transaction will be characterized as a lease for the purposes of allowing investment credits and capital cost recovery allowances to the nominal lessor. Lessors will be able to receive cost recovery allowances and investment tax credits with respect to *404 qualified leased property, while it is expected that lessees will receive a very significant portion of the benefits of these tax advantages through reduced rental charges for the property (in the case of finance leases) or cash payments and/or reduced rental charges in the case of sale-leaseback transactions. [S. Rept. No. 97-144 (1981), 1981-2 C.B. 412, 432; emphasis supplied.]
The safe harbor leasing provisions are further explained in the General Explanation of the Economic Recovery Tax Act of 1981, dated December 31, 1981, prepared by the Staff of the Joint Committee on Taxation: The new provision is a significant change overriding several fundamental principles of tax law. Traditionally, the substance of a transaction rather than its form controls the tax consequences of a transaction. In addition, a transaction generally will not be given effect for tax purposes unless it serves some business purpose aside from reducing taxes. Because the leasing provision was intended to be only a transferability provision, many of the transactions that will be characterized as a lease under the safe harbor will have no business purpose (other than to transfer *405 tax benefits). When the substance of the transaction is examined, the transaction may not bear any resemblance to a lease. [Staff of the J. Comm. on Taxation, General Explanation of the Economic Recovery Act, at 104 (J. Comm. Print 1981); emphasis supplied.]
The passages quoted above are indicative of the liberal nature of the safe harbor leasing provisions. Those provisions were enacted by Congress to "encourage particular conduct and achieve certain policy goals." Fox v. Commissioner, 82 T.C. 1001, 1025 (1984). Further, the safe harbor leasing provisions were intended to facilitate the transfer of tax benefits to those companies that were able to utilize those benefits and simultaneously spur new investment by those companies. See Papago Tribal Utility Authority v. Federal Energy Regulatory Commission, 773 F.2d 1056, 1065 (9th Cir. 1985); Greene v. Commissioner, 88 T.C. 376, 382 (1987). The safe harbor leasing provisions were repealed by section 209 of the Tax Equity and Financial Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, 442. Section 168(f)(8)
Section 168(f)(8) was the operative provision *406 for safe harbor leasing activity. Section 168(f)(8)(A) generally provided that, if the parties to a lease of qualified leased property agree to have that section apply, the agreement is treated as a lease of the property, the lessor is treated as the owner of the property, and the lessee is treated as the lessee of the property. Section 168(f)(8)(B) set forth certain requirements, concerning the lessor and the lease term, that were to be met in order to satisfy section 168(f)(8). The parties agree that those requirements are satisfied in this case. The controversy here involves the requirements of section 168(f)(8)(D), which defined qualified leased property as follows: (D) Qualified leased property defined. -- For purposes of subparagraph (A), the term "qualified leased property" means recovery property (other than a qualified rehabilitated building within the meaning of section 48(g)(1)) which is -- (i) new section 38 property (as defined in section 48(b)) of the lessor which is leased within 3 months after such property was placed in service and which, if acquired by the lessee, would have been new section 38 property of the lessee, (ii) property -- (I) which was new *407 section 38 property of the lessee, (II) which was leased within 3 months after such property was placed in service by the lessee, and (III) with respect to which the adjusted basis of the lessor does not exceed the adjusted basis of the lessee at the time of the lease, or * * * For purposes of this title (other than this subparagraph), any property described in clause (i) or (ii) to which subparagraph (A) applies shall be deemed originally placed in service not earlier than the date such property is used under the lease. In the case of property placed in service after December 31, 1980, and before the date of the enactment of this subparagraph, this subparagraph shall be applied by substituting "the date of the enactment of this subparagraph" for "such property was placed in service."
The parties agree that the properties in issue were new property for investment tax credit purposes, that is, the original use of the properties commenced with the lessee, Conrail. Qualified Lease Property
Petitioner's Position
Petitioner contends that the rail properties included under the Armstrong/Conrail safe harbor leases were leased in 1981 within 3 months of the time *408 they were placed in service by Conrail; that the leased properties were placed in service as a single integrated unit; and that the other requirements of section 168(f) have all been satisfied. Respondent's Position
Respondent contends that the Armstrong/Conrail safe harbor leasing transactions did not meet the requirements of section 168(f)(8). Respondent argues that the rail properties were not leased within 3 months of the time they were placed in service; a portion of the leased property was not recovery property because it was financed by the State of New York; petitioner's adjusted bases in the leased properties exceeded the adjusted bases of Conrail in those properties; and certain portions of the leased properties were not leased in 1981 because they were not identified in the safe harbor lease contract when it was executed. The focus of this dispute is on whether the leases between Armstrong and Conrail applied to property placed in service during the required time frame. Resolution of the dispute requires analysis of the authorities and the evidence regarding when the subject property was placed in service for depreciation and investment tax credit purposes. *409 Applicable Authorities
Petitioner argues that "each of Conrail's rail projects constitutes a 'facility' permitted to be placed in service as a facility for safe harbor leasing purposes." Section 5c.168(f)(8)-6(b)(2)(i), Temporary Income Tax Regs., 46 Fed. Reg. 51911 (Oct. 23, 1981), provided what is referred to as the facility rule. That rule is that, "If an entire facility is leased under one lease, property which is part of the facility will not be considered placed in service under this rule until the entire facility is placed in service." In many ways, determination of whether a project is a facility involves the same analysis, set forth below, as to whether a project is a single integrated unit. Respondent contends, however, that the facility rule is inapplicable because petitioner did not lease each entire project under a single lease. Petitioner admits that "costs attributable to the Oak Island Project were included under both the first and second December 31 documents; and, finally, the costs attributable to the Olean Project were split between the December 17 document and the second December 31 document." Petitioner did not lease each project under *410 a single lease and may not invoke the facility rule of the temporary regulation. Petitioner also argues that, "under ordinary placement in service principles applicable to complex properties, each of Conrail's rail projects constitutes an integrated unit of property required to be placed in service as a single property." Petitioner contends that all of the components constructed as part of the rail yard projects were necessary to the safe and efficient operation of the whole and thus functioned together as a single unit. Petitioner relies on Hawaiian Independent Refinery v. United States, 697 F.2d 1063 (Fed. Cir. 1983); Public Service Co. of New Mexico v. United States, 431 F.2d 980 (10th Cir. 1970); Consumers Power Co. v. Commissioner, 89 T.C. 710 (1987); Noell v. Commissioner, 66 T.C. 718 (1976); LTV Corp. v. Commissioner, 63 T.C. 39 (1974); Madison Newspapers v. Commissioner, 47 T.C. 630 (1967); Oglethorpe Power Corp. v. Commissioner, T.C. Memo 1990-505; and Siskiyou Communications, Inc. v. Commissioner, T.C. Memo 1990-429, *411 for the proposition that the safe harbor lease properties should be viewed as single integrated units. In Hawaiian Independent Refinery v. United States, 697 F.2d 1063 (Fed. Cir. 1983), the Court of Appeals for the Federal Circuit addressed the placed-in-service issue with respect to an oil refinery complex. The complex consisted of the refinery facility, an offshore tanker-mooring facility located 2 miles from the refinery but connected to the refinery by a pipeline, and two other pipelines used to transport finished products from the refinery to storage facilities. The court concluded, among other things, that the two off-site refinery properties could not be considered separate from the refinery itself for purposes of the investment tax credit. Rather, the court stated that the entire refinery complex was to be treated as a single asset. The court concluded: The trial judge, noting that nothing in the statutes or regulations deals specifically with what is a single property for purposes of section 50, IRC, reasoned that the tanker-mooring facility is used to transport raw materials to the refinery and the products pipelines connect the refinery with *412 HIRI's [Hawaiian Independent Refinery] storage facilities, so that the two offsite components, "in conjunction with the refinery itself, functionally form a single property," construction of which began when construction was begun on the refinery component. We regard this as a reasonable approach, particularly since the refinery complex was conceived, designed, and constructed as a unit, the three components being placed in operation concurrently. * * * [697 F.2d at 1069; emphasis supplied.]
The Court of Appeals for the Tenth Circuit, in Public Service Co. of New Mexico v. United States, 431 F.2d 980 (10th Cir. 1970), considered whether component assets of an electrical power plant could be placed in service prior to the time that the entire plant was placed in service. The component assets included a turbine generator, a cooling tower, a transformer, a main power plant building, and a steam generating unit. The court concluded that the various assets were placed in service when the entire plant became operational because: No one of these * * * [component assets] would serve any useful purpose to * * * [Public Service Co.] but all *413 of them properly fitted together by the contractor, together with the building, constituted a complete unit which was operational and served the purpose intended by * * * [Public Service Co.]. It was the complete operational unit that * * * [the contractor] agreed to construct from the many components and deliver to * * * [Public Service Co.] as an electrical power generating plant. [431 F.2d at 984.]
Consumers Power Co. v. Commissioner, 89 T.C. 710 (1987), involved the placed-in-service issue with respect to a pumped storage hydroelectric plant. In a pumped storage hydroelectric plant, water is pumped from a lower reservoir, during periods when electrical power demand is low, up to a higher elevation storage reservoir. When supplemental power is needed, water is released, turning hydraulic turbine generators and producing electrical power. In November 1972, the plant began pumping water into the upper reservoir, the generating mode was first synchronized with the transmission system, and power was produced. The plant produced electrical power ranging from 18 percent to 89 percent of capacity, and electrical power was sold to customers *414 through December 1972. The unit was shut down temporarily in December 1972, and testing was suspended. Preoperational testing continued on the unit through January 1973, when the repairs were completed and the taxpayer accepted the unit from the general contractor. We there concluded: Not until January 17, 1973, after * * * [the unit] successfully had completed all phases of preoperational testing, thereby demonstrating that it was available for service on a regular basis, was the unit in a state of readiness and availability for its specifically assigned function within the meaning of sections 1.46-3(d)(1)(ii) and 1.167(a)-11(e)(1)(i), Income Tax Regs. [Consumers Power Co. v. Commissioner, 89 T.C. at 724.]
Further, with respect to whether the plant and the reservoir should be regarded as single property for depreciation and investment tax credit purposes, we stated: In our opinion, based on the foregoing, the Ludington Plant must be viewed as one integrated unit because the physical plant and the reservoir operate simultaneously and as a unit in order to produce electrical power. [89 T.C. at 726.]
In Noell v. Commissioner, 66 T.C. 718 (1976), *415 we addressed whether a taxpayer was entitled to an investment tax credit for an airplane runway. Prior to the time the runway was completed, airplanes landed on a grass strip. Some airplanes used the runway after a rock base was laid, but the roughness of the rock surface made it unsatisfactory for permanent use. Further, due to the wetness of the underlying black soil, the rock surface was usable only under good weather conditions. The determinative issue was "when the landing strip was placed in a state of availability for a specific function in petitioner's trade or business." 66 T.C. at 728. We concluded: The runway was not "in a condition or state of readiness" in 1967. The rock surface on which some planes landed in 1967 was clearly only a stage in the construction of the facility. This surface was quite unsatisfactory and pilots risked damaging their aircraft by landing on it. Moreover, the rock surface could not be used on a permanent basis, since the landing area easily could be ruined by the weather. In fact, the runway here had been ruined three times before petitioner finally put the pavement down. In short, the facility was simply not available *416 for full service until the runway was paved in 1968. We therefore hold that the landing facilities were not placed in service until that year. [66 T.C. at 729.]
LTV Corp. v. Commissioner, 63 T.C. 39 (1974), involved a contract to lease computer equipment. Pursuant to the contract, the computer equipment was to be installed by the seller on or before December 31, 1961. The computer was on the taxpayer's premises prior to the installation date. Installation of the computer, however, was not completed until after December 31, 1961. We there concluded that the taxpayer was entitled to an investment tax credit in 1962 because "the what in this case is an installed and operating computer; one that is available for use by the * * * [taxpayer] for the purpose for which it was purchased." 63 T.C. at 46. We further stated that "IBM [the seller] felt its obligation was not completed until there was a mutual agreement between IBM and the customer [the taxpayer therein] that the machine was operational and ready to perform the functions for which it was intended." 63 T.C. at 48. In Madison Newspapers, Inc. v. Commissioner, 47 T.C. 630 (1967), *417 this Court addressed whether certain units of a printing press were new section 38 property for purposes of the investment tax credit. Components of the units had been delivered to the taxpayer prior to installation. Respondent there argued "that * * * [the taxpayer] had control over the units prior to * * * [the year the credit was claimed], as evidenced by the fact that * * * [the taxpayer], directly or indirectly, paid the salaries of all those connected with the installation of the units and allegedly could have, at any time, dismissed any of those so working." 47 T.C. at 634. The taxpayer argued that it did not have control over the units until they were ready for commercial operation and acceptance, that a contractor had ultimate responsibility for the installation, and that it contracted for installed units, not component parts. We there concluded that the taxpayer's physical possession of the units was not determinative. Rather, the taxpayer had contracted for installed units, not an uninstalled assortment of components, and those units were not in existence for investment tax credit purposes until they were installed. 47 T.C. at 637. *418 In Oglethorpe Power Corp. v. Commissioner, T.C. Memo 1990-505, this Court concluded that a coal-fired electrical generating plant was leased within the required 3-month window under section 168(f)(8)(D)(iii). The electrical generating plant was part of the Georgia Integrated Transmission System (the system), an integrated system of electrical transmission lines and substations. After initial separate component testing was completed, the unit was synchronized with the system. The period between initial synchronization and commercial operation is referred to as the test period. During that period, the components of the unit are integrated into a coordinated system, problems are resolved, and the unit is then moved to commercial readiness. Respondent argued that the unit was placed in service when the unit was first synchronized with the system. The taxpayer argued that "the testing of * * * [the unit], as a fully integrated unit, had not begun at the time of initial synchronization, and that the test period which followed synchronization revealed a series of major defects which made it impossible for the unit to serve its intended *419 purpose until the defects were corrected." Oglethorpe Power Corp. v. Commissioner, T.C. Memo 1990-505, 1990 Tax Ct. Memo LEXIS 558, 60 T.C.M. (CCH) 850, 858-859, T.C.M. (RIA) 90505 at 2470. The opinion in Oglethorpe Power Corp. discussed the purpose of the safe harbor leasing provisions and the placed-in-service requirement contained in section 168(f)(8)(D)(ii). In determining the placed-in-service dates, the Court analyzed the provisions of sections 1.167(a)-11(e)(1)(i) and 1.46-3(d)(1)(ii), Income Tax Regs., and section 5c.168(f)(8)-6(b)(2), Temporary Income Tax Regs., 46 Fed. Reg. 51911 (Oct. 23, 1981). Section 1.167(a)-11(e)(1)(i), Income Tax Regs., provides: The term "first placed in service" refers to the time the property is first placed in service by the taxpayer, not to the first time the property is placed in service. Property is first placed in service when first placed in a condition or state of readiness and availability for a specifically assigned function, whether in a trade or business, in the production of income, in a tax-exempt activity, or in a personal activity. * * * [Emphasis supplied.]
Similarly, section *420 1.46-3(d)(1)(ii), Income Tax Regs., relating to the investment tax credit, provides: (d) Placed in service. (1) For purposes of the credit allowed by section 38, property shall be considered placed in service in * * * * * * (ii) The taxable year in which the property is placed in a condition or state of readiness and availability for a specifically assigned function, whether in a trade or business, in the production of income, in a tax exempt activity, or in a personal activity. [Emphasis supplied.]
Section 5c.168(f)(8)-6(b)(2), Temporary Income Tax Regs., 46 Fed. Reg. 51911 (Oct. 23, 1981), provides: (2) Placed in service. (1) Property shall be considered as placed in service at the time the property is placed in a condition or state of readiness and availability for a specifically assigned function. * * * Based upon the similar language contained in the foregoing sections, we concluded in Oglethorpe Power Corp. that, for safe harbor leasing purposes, a property is placed in service when first "placed in a condition of or state of readiness and availability for a specifically assigned function." T.C. Memo 1990-505, 1990 Tax Ct. Memo LEXIS 558, 60 T.C.M. (CCH) 850, 859, T.C.M. (RIA) 90505 at 90-2470 (1990). *421 We found that the components of the unit were tested separately to the extent possible to eliminate problems that could be detected prior to synchronization with the system. We concluded, however, that testing of an electrical generating plant unit within the system could not be performed until the unit was synchronized with the system and that the major defects that were found to exist could not have been discovered without that testing. The unit was prevented from achieving generating levels near its rated capacity until those defects were remedied. Therefore, we concluded, the unit was not placed in service until the preoperational system testing was completed and the unit was achieving a consistent output near its rated capacity. The reasoning in Oglethorpe is persuasive. Nevertheless, it does not aid petitioner when applied to the facts in this case. Respondent notes that "in none of the cases cited by petitioner where a court found that component properties constituted a single integrated property had such property been used, other than in preoperational testing prior to the time it was placed in service." Respondent contends that, contrary to the safe harbor lease *422 properties in the present case, the properties in those cases were of no use to their owners until they were integrated with other components comprising a single integrated unit. We agree with respondent that "it is rare for a court to find that property is placed in service after it has been used." Property will be found to have been placed in service to the extent that it has been used for its specifically assigned function, as explained below. The applicable authorities are consistent in their analysis of placed in service where the completion of a component is integral to the availability and readiness of a project as a whole for its specifically assigned function. In that instance, part of a project is not considered placed in service until the whole project is placed in service. In our view of the evidence, the safe harbor leases here involved projects consisting of subprojects; therefore a similar analysis is appropriate. Thus we must decide whether the subprojects were integral to the whole project and, if not, when the subprojects were completed and used for their specifically assigned function. The Evidence
The placed-in-service determination is significant *423 in the present case because safe harbor lease property must be qualified leased property under section 168(f)(8)(D) -- leased within 3 months of the time it was placed in service (the window). Three of the safe harbor leases were dated as of December 17, 1981, and six were dated as of December 31, 1981. The opening dates for the window therefore are September 16, 1981, and September 30, 1981. Petitioner argues that "Conrail's regular procedure of placing self constructed properties in service on an entire project or integrated subproject basis constitutes a permissible method of tax accounting" and that that procedure was used with respect to the safe harbor lease properties in the present case. Petitioner argues that the placed-in-service dates under that procedure are conclusive. At trial, petitioner offered documents and the testimony of Conrail accounting and supervisory personnel regarding the procedure used by Conrail for determining when a project was placed in service, including copies of Conrail internal project completion reports (Forms CE-355). Some of the Forms CE-355 offered by petitioner were not admitted in evidence because we concluded that alterations of those *424 documents and other evidence of the manner in which dates were chosen undermined their reliability. Despite our rulings during trial, petitioner relies in its briefs on the Forms CE-355, asserting that "Conrail merely tailored some of the paperwork to fit the requirements of the safe harbor leasing program." We reiterate that the evidence of alteration of the Forms CE-355 undermines their reliability for purposes of this case, regardless of whether such forms were used consistently for other purposes. The trial testimony of current and former Conrail personnel was in substantial part based on the Forms CE-355 and otherwise was not persuasive. We conclude that the contemporaneous writings, including the internal Conrail memoranda described in our findings, and the inferences to be drawn from deliberate alterations are entitled to greater weight. Many of the controlling facts, however, have been stipulated or are undisputed. We have accepted the testimony of Conrail's employees as to the functions of specific properties. 1. Orrville-to-Colsan Project
The Orrville-to-Colsan project consisted of construction of a new signal and rail TCS along a 76-mile corridor. That *425 project was conceived and designed as entailing the installation of signaling units along a 76-mile stretch of track. The construction of the system proceeded in segments. After a segment was completed, it was cut over for use by Conrail. A computer was installed in 1980 to govern the entire TCS when completed. The first 10 segments of the Orrville-to-Colsan project were cut over before June 1981 and were used by local crews for train operation prior to September 1981. The final segment was cut over on October 26, 1981. The use of a segment after it was cut over manifests the independent character of the segment in relation to the other segments. The individual segments were not necessary to the whole but, rather, were subprojects. Accordingly, only the final segment is within the 3-month window. Although the computer was installed in 1980, the computer was not ready to perform its specifically assigned function until the final segment was cut over on October 26, 1981; the computer was therefore placed in service within the 3-month window. 2. Allentown Yard
The Allentown yard project involved the construction of a new rail yard on the site of two previously separate *426 yards. The automatic hump control operation was a significant portion of the Allentown project. That operation allowed for uncoupling of cars, sorting of those cars by destination, and automatic reforming of those cars into new trains. The automatic hump control operation components, the automatic route switching and the retarder control, were installed and tested and were operating in January 1981. Software and operational changes were subsequently made and completed in November 1981. Those software changes were design changes; they were not in the original plans. The operation was available and ready to perform its specifically assigned function in January 1981, and it was therefore placed in service at that time and not during the relevant 3-month period. See section 1.46-3(d)(2)(iii), Income Tax Regs.
3. The Oak Island Project
The Oak Island project involved the installation of an automatic hump control operation similar to the one installed in Allentown. The Oak Island operation was completed in July 1981. Final adjustments to the Oak Island operation were made through September 10, 1981. In November 1981, an adjustment to the computer printer was made. That *427 adjustment did not affect the specific function of the unit but, rather, entailed the elimination of a paper jam. Accordingly, the project was placed in service on September 10, 1981, and not within the 3-month window. See section 1.46-3(d)(2)(iii), Income Tax Regs.
4. The Olean Yard and TCS
The Olean yard and TCS project consisted of constructing a new rail yard near the intersection of two main lines. Also, two-way automatic signaling and switching was installed along a 20-mile stretch of the east-west rail line adjacent to the yard. The new yard was completed in 1980. The TCS was completed in four segments. The TCS between Cuba Junction and Olean was cut over on May 21, 1980; the West Olean-to-East Salamanca portion was cut over on April 8, 1981; the TCS between West Olean and Olean was cut over on December 17, 1981; and the TCS between Cuba Junction and Salamanca was cut over in March 1982. The TCS between West Olean and Olean was the only segment placed in service within the 3-month window. Adjusted Basis of the Leased Properties
Section 168(f)(8)(D)(ii)(III) requires that the safe harbor lessor's adjusted basis in the qualified leased property not exceed *428 the adjusted basis of the lessee in the property at the time of the lease. Petitioner contends that it acquired an adjusted basis in the leased properties no greater than Conrail's actual cost basis. Respondent argues that the cost basis of certain components of the safe harbor lease projects should be reduced to reflect depreciation taken during the years prior to the lease of the properties. Respondent's argument assumes that the properties were placed in service prior to 1981. We have concluded that petitioner is not entitled to any safe harbor leasing benefits for properties that were placed in service outside of the 3-month window in 1981; no taxable period passed from the time the properties were placed in service to the time they were leased. Conrail's cost bases, therefore, were the equivalent of their adjusted bases in the safe harbor lease properties. Property Identified to the Contract
Respondent's final argument on the safe harbor leases is that the property that was the subject of the lease agreement dated "as of December 31, 1981" for $ 16,500,000 was not leased in 1981. Respondent argues that, because Conrail had more fourth-quarter benefits than it actually *429 sold, its commitment to sell a dollar amount of tax benefits to petitioner was not sufficient to identify particular properties to be transferred. According to respondent, there is, subsumed in section 168(f)(8), a requirement that each leased property to which an election is made be identified before the election can become effective. Respondent contends that title to leased property could not pass from Conrail to Armstrong prior to its identification by Conrail, which did not occur until, at the earliest, January 19, 1982. We have found as a fact that the supplements to exhibit A to the $ 16,500,000 lease dated as of December 31, 1981, were not provided to Armstrong prior to January 19, 1982. This finding was based on the dates of certain supporting documents prepared by a Conrail employee. The documents and the testimony of that Conrail employee impeached testimony that the schedules were attached to the leases when they were executed in 1981. When the Court ordered the original documents produced, the supplements were not attached to the original leases, and those showing a total of $ 16,500,000 were attached to supporting documents dated January 19, 1982. Nonetheless, *430 petitioner contends that respondent raised this issue for the first time on brief, thereby unfairly prejudicing petitioner. The statutory notice broadly determined that petitioner had failed to establish that the deductions and investment tax credits claimed on its return met the safe harbor leasing requirements of section 168, thus encompassing all requirements in section 168(f). Questions about the contents of the documents executed in December 1981 were raised during the stipulation process, in respondent's pretrial memorandum, and at trial. Any prejudice to petitioner results only from impeachment of petitioner's witnesses by petitioner's records belatedly produced. This issue is decided on that evidence and is not affected by allocation of the burden of proof. Petitioner contends that State law requirements that property be identified are not controlling and that specific identification of the safe harbor lease properties does not have to be made until the filing of the information return. Petitioner relies on the following language of section 5c.168(f)(8)-1(c), Temporary Income Tax Regs., 46 Fed. Reg. 51908 (Oct. 23, 1981), for the assertion that property *431 is not required to be identified under section 168(f)(8): An agreement that meets the requirements of section 168(f)(8) and sections 5c.168(f)(8)-2 through 5c.168(f)(8)-11 may be treated by the parties as a lease for Federal tax law purposes only. Similarly, a sale by the lessee of the leased property to the lessor in a transaction where the property is leased back under an agreement that meets the requirements of section 168(f)(8) may be treated by the parties as a sale for Federal tax law purposes only. The agreements need not comply with State law requirements concerning transfer of title, recording, etc.
Petitioner contends that the above regulation obviates the necessity for identification of the property subject to a safe harbor lease. That section, however, merely dispenses with State law formalities. The issue is whether a binding agreement could occur in 1981 without specification between the parties as to the subject of the agreement. Prior to 1982, the parties to the lease had agreed on the dollar amount of property to be transferred, but they had not identified the property other than as placed in service between November 1 and December 31, 1981. As to *432 the specific properties, it was an agreement to agree. Absent identification of the properties prior to the end of the year, the agreement was not susceptible of enforcement and could not take effect. By not challenging leases other than the $ 16,500,000 lease dated December 31, 1981, respondent is implicitly agreeing that the properties were sufficiently identified in the subsequently prepared schedules. He is only challenging the timeliness as to one lease, and, on the evidence, we conclude that he is correct that the identification of the items associated with that lease did not occur in 1981. The parties agree that the $ 16,500,000 lease supplement prepared in 1982 included costs associated with the Oak Island, Allentown, and Olean projects. Although we have concluded that the Allentown and Oak Island projects were not placed in service during the crucial 3-month period, a portion of the Olean project was placed in service on December 17, 1981. This property, however, was not leased to petitioner in 1981. Replacement Track Property
Section 168(f)(3) provides: (3) RRB replacement property. -- (A) In general. -- In the case of RRB replacement property placed in *433 service before January 1, 1985, the recovery deduction for the taxable year shall be, in lieu of the amount determined under subsection (b), the amount determined by applying to the unadjusted basis of such property the applicable percentage determined under tables prescribed by the Secretary. * * *
That section further provides that, for property placed in service in 1981, the recovery period is 1 year. The Senate Finance Committee report states that the purpose of the accelerated recovery period is as follows: Under the committee bill, Code section 167(r) permitting the use of the RRB method is repealed as of January 1, 1981. Property placed in service after 1980 that would have been RRB property under present law will be treated as 5-year property under ACRS. During a 4-year transition period (1981-1984), a special transition rule is provided for such property that would have been expensed under RRB (replacements). Costs of property that would have been capitalized under RRB (additions and betterments) are treated the same as other 5-year property under ACRS. Thus, such costs are subject to the same rules that apply for other eligible property placed in service *434 after 1980. Replacement property (which would be expensed under RRB) is phased in to ACRS over 5 years. Replacement property placed in service in 1981 will be expensed. * * * [S. Rept. No. 97-174 (1981), 1981-2 C.B. 412, 430.]
Petitioner argues that section 168(f)(8)(G) and section 168(f)(10), when read in conjunction with section 1.168-5(a)(1)(ii), Income Tax Regs., provide authority for the proposition that the RRB costs were 100-percent deductible for the year in which they were transferred under the lease. Section 168(f)(8)(G) provides: (G) Regulations. -- The Secretary shall prescribe such regulations as may be necessary to carry out the purposes of this paragraph, including (but not limited to) regulations consistent with such purposes which limit the aggregate amount of (and timing of) deductions and credits in respect of qualified leased property to the aggregate amount (and the timing) allowable without regard to this paragraph.
Section 168(f)(10) provides, in relevant part: (10) Transferee bound by transferor's period and method in certain cases. -- (A) In general. -- In the case of recovery property transferred in a transaction described *435 in subparagraph (B), the transferee shall be treated as the transferor for purposes of computing the deduction allowable under subsection (a) with respect to so much of the basis in the hands of the transferee as does not exceed the adjusted basis in the hands of the transferor. (B) Transfers covered. -- The transactions described in this subparagraph are -- * * * (iii) an acquisition followed by a leaseback to the person from whom the property is acquired.
Section 1.168-5(a)(1)(ii), Income Tax Regs., provides: (ii) The provisions of paragraph (a)(1)(i) of this section (relating to a one year recovery period) do not apply to any taxpayer who did not use the RRB method of depreciation under section 167 as of December 31, 1980. In such case, RRB replacement property placed in service by the taxpayer after December 31, 1980, shall be treated as other 5-year recovery property under section 168.
Petitioner contends that Conrail both originally placed in service the RRB replacement property in question during 1981 and used the RRB method of depreciation in 1980 (and in previous years). Petitioner therefore contends that Conrail was a taxpayer to which section *436 168(f)(3) applied. Petitioner further argues that it purchased the property, leased it back to Conrail, and thus became the owner of the leased property for Federal income tax purposes and was bound by the method used by Conrail, i.e., the RRB method, and, accordingly, was entitled to the benefit of the transitional rule under section 168(f)(10). The purpose of the transitional rule of section 168(f)(3) was to phase into ACRS (accelerated cost recovery system) the property of a taxpayer who had previously used the RRB method under section 167. It does not generally apply to a taxpayer, such as petitioner, who had not used the RRB method. With respect to safe harbor lease transactions, section 5c.168(f)(8)-5(c), Temporary Income Tax Regs., 46 Fed. Reg. 51910 (Oct. 23, 1981), provides: (c) Minimum term. For purposes of this section, the term of the lease must at least equal the period prescribed under section 168(c)(2) for the recovery property class of the leased property. For example, if a piece of leased equipment is in the 5-year recovery property class, the lease agreement must have a minimum term of 5 years. In general, the determination of whether *437 property is 3-year recovery property, 5-year recovery property, etc., in the hands of the lessor will be based on the characterization of the property in the hands of the owner as determined without regard to the section 168(f)(8) lease. Thus, for example, property which is public utility property or RRB replacement property absent the section 168(f)(8) lease will be characterized as such in the hands of the lessor for purposes of section 168(f)(8). However, with respect to RRB replacement property, the transitional rule of section 168(f)(3) shall be inapplicable to the lessor. [Emphasis supplied.]
Similarly, section 5c.168(f)(8)-7(e), Temporary Income Tax Regs., 46 Fed. Reg. 51912-51913 (Oct. 23, 1981), provides: (e) ACRS deductions. The deductions that the lessor is allowed under section 168(a) with respect to property subject to a section 168(f)(8) lease shall be determined without regard to the limitation in section 168(f)(10)(B)(iii). The recovery class of qualified leased property in the hands of the lessor shall be determined by the character of the property in the hands of the owner of the property without regard to section 168(f)(8). Any *438 elections under section 168(b)(3) by the lessor with respect to the class of recovery property to which the qualified leased property is assigned shall apply to the leased property. However, with respect to RRB replacement property, the transitional rule of section 168(f)(3) shall be inapplicable to the lessor. [Emphasis supplied.]
Petitioner argues that the cited temporary regulation sections are merely interpretive and should be granted little deference. Petitioner also contends that those regulations are invalid. Respondent argues that the regulations are consistent with the purpose of section 168(f)(8) and in conformity with the congressional grant of authority to prescribe regulations contained in section 168(f)(8)(G). We agree with respondent. The Supreme Court has articulated the following standard for determining the validity of Treasury regulations: Regulations command our respect, for Congress has delegated to the Secretary of the Treasury, not to this Court, the task "of administering the tax laws of the Nation." United States v. Cartwright, 411 U.S. 546, 550, 36 L. Ed. 2d 528, 93 S. Ct. 1713 (1973); accord, United States v. Correll, 389 U.S. 299, 307, 19 L. Ed. 2d 537, 88 S. Ct. 445 (1967); *439 see 26 U.S.C. sec. 7805(a). We therefore must defer to Treasury Regulations that "implement the congressional mandate in some reasonable manner." United States v. Correll, supra at 307; accord, National Muffler Dealers Assn. v. United States, 440 U.S. 472, 476-477, 59 L. Ed. 2d 519, 99 S. Ct. 1304 (1979). To put the same principle conversely, Treasury Regulations "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes." Commissioner v. South Texas Lumber Co., 333 U.S. 496, 501, 92 L. Ed. 831, 68 S. Ct. 695 (1948); accord, Fulman v. United States, 434 U.S. 528, 533, 55 L. Ed. 2d 1, 98 S. Ct. 841 (1978); Bingler v. Johnson, 394 U.S. 741, 749-751, 22 L. Ed. 2d 695, 89 S. Ct. 1439 (1969). * * * [Commissioner v. Portland Cement Co. of Utah, 450 U.S. 156, 169, 67 L. Ed. 2d 140, 101 S. Ct. 1037 (1981).]
Legislative regulations, that is, those emanating from a specific congressional grant of authority and not merely from the Treasury's general rule-making power under section 7805(a), are entitled to the highest standard of deference. See, e.g., United States v. Vogel Fertilizer Co., 455 U.S. 16, 24, 70 L. Ed. 2d 792, 102 S. Ct. 821 (1982); Rowan Companies, Inc. v. United States, 452 U.S. 247, 253, 68 L. Ed. 2d 814, 101 S. Ct. 2288 (1981). *440 Petitioner argues that, notwithstanding the express delegation of authority in section 168(f)(8)(G), quoted above, the temporary regulations are interpretive, are contrary to the "plain language" of section 168(f)(3) and 168(f)(10), and are unreasonable. Petitioner argues that section 168(f)(3)(A) "mandates that Armstrong should claim the one year 100 percent recovery deduction specified under such section." Moreover, according to petitioner, the regulations "contradict the letter and purpose of Code section 168(f)(10)," quoted above. Petitioner also argues that the generally liberal intent and purpose of section 168(f) should override the regulations. Respondent argues that the purpose of section 168(f)(10) was to limit, and not to increase, the cost recovery deductions of certain transferees. Respondent here reasonably relies on the legislative history describing section 168(f)(10) as an anti-churning rule. Petitioner responds that "The transferor/lessee under section 168(f)(10) may transfer only the tax benefits which it would be entitled to claim itself: no more and no less." Petitioner would have us conclude that a provision intended to prevent "step up" of tax benefits *441 would mandate that a lessee take advantage of an elective tax benefit. We cannot reach that anomalous result. Considering all of the arguments of the parties, we cannot conclude that the interpretation of the statute in the regulations is unreasonable or invalid. See National Muffler Dealers Assn., Inc. v. United States, 440 U.S. 472, 488, 59 L. Ed. 2d 519, 99 S. Ct. 1304 (1979). Petitioner is not, therefore, entitled to use the transitional rule of section 168(f)(3). Decision will be entered under Rule 155.