**ARMSTRONG WORLD INDUSTRIES, INC., and Affiliated Companies, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE.**

No. 92–7032.

United States Court of Appeals, Third Circuit.

Argued Aug. 6, 1992.

Decided Sept. 9, 1992.

Paul A. Cunningham (argued), A. Carl Kaseman, III, James G. Rafferty, Pepper, Hamilton & Scheetz, Washington, D.C., for appellants; John F. Fansmith, Jr., Consol-

idated Rail Corp., Philadelphia, Pa., of counsel.

James A. Bruton, Acting Asst. Atty. Gen., Gary R. Allen, Gilbert S. Rothenberg (argued), Kimberly S. Stanley, U.S. Dept. of Justice, Tax Div., Washington, D.C., for appellee.

Before: GREENBERG, ALITO, and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

Armstrong World Industries, Inc., and its affiliated companies (hereinafter referred to as "Armstrong"), appeal from a decision of the Tax Court entered on October 29, 1991, sustaining a determination of the Commissioner of Internal Revenue that Armstrong had a $5,032,135 income tax deficiency for tax year 1981 and denying Armstrong's claim of an overpayment of approximately $20 million in taxes for the same year. The deficiency resulted from the Commissioner's disallowance of depreciation deductions and investment credits claimed by Armstrong under the now repealed "safe-harbor leasing" rules of Internal Revenue Code Section 168(f)(8).[1] Armstrong predicated its claim for overpayment on a theory that it should have been allowed to depreciate in one year certain property it acquired in three safe-harbor leasing agreements rather than over five years as it had done.

This appeal implicates three questions: (1) whether the properties transferred in the safe-harbor transactions were "placed in service" within the required statutory time period; (2) whether one of the safe-harbor lease agreements was invalid because it did not contain an identification of the subject properties on the date of its execution; and (3) whether the treasury regulations, which prohibited safe-harbor lessors from using a transitional depreciation rule found in Section 168(f)(3), conflicted with the plain language of the Code.

The Tax Court concluded that the majority of the transferred properties were not placed in service during the necessary period, the incomplete safe-harbor leasing agreement was invalid, and Armstrong was not entitled to invoke the special transitional rule of Section 168(f)(3). For the reasons that follow, we will affirm.

## I.

## BACKGROUND

### A. Procedure

In broad terms, the safe-harbor leasing rules established in Section 168(f)(8) permitted one taxpayer to sell certain of its tax benefits to another. The tax benefit transfer could be accomplished through a fictional sale and leaseback of "qualified leased property." The agreement would be respected as a true transaction for tax purposes only, and thus the buyer-lessor, as the new "owner" of the property, would become entitled to the associated tax benefits. "Qualified leased property" under the Code was property that, *inter alia*, was leased within three months after the date it was "placed in service." Section 168(f)(8)(D)(ii).

In December 1981, Armstrong entered into nine safe-harbor leasing agreements purchasing a number of railroad properties from Consolidated Rail Corporation ("Conrail"). Therefore, Armstrong's 1981 income tax return included depreciation deductions and investment tax credits reflecting these transactions. However, the Commissioner did not completely accept Armstrong's returns and sent Armstrong a timely notice of deficiency stating that it had failed to establish that three of the agreements satisfied the requirements of Section 168(f)(8). Armstrong petitioned the Tax Court for a review of the Commissioner's determination, but the court agreed that the three agreements did not comply with Section 168(f)(8), for it found in a detailed opinion that some of the included

---

**1.** All Code section references, except those relating to this court's jurisdiction, are to the Internal Revenue Code as in effect in 1981. The safe-harbor leasing provisions were repealed for transactions entered into after 1982 by the Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. No. 97–248, 96 Stat. 324.

properties had not been placed in service within the three months prior to the date of the agreements and that one of the three agreements did not identify the subject properties on the execution date. 62 T.C.M. (CCH) 148 (1991).

The second aspect to the controversy involves Armstrong's claim for a tax refund of approximately $20 million for 1981 predicated on its assertion that it was entitled to a deduction in that year of the entire cost of certain track replacement property acquired from Conrail in another three of the nine safe-harbor lease agreements. The Tax Court denied this claim, finding that Armstrong had properly depreciated the track replacement property over a five-year period beginning in 1981 and that the applicable treasury regulations precluded safe-harbor lessors from electing the benefit of Section 168(f)(3)'s special one-year recovery period for such property. The court upheld the regulations over Armstrong's argument that they were contrary to the plain language of the Code or were otherwise arbitrary, capricious or contrary to law.[2] Armstrong filed a timely notice of appeal on January 21, 1992, see 26 U.S.C. § 7483,[3] and we have jurisdiction pursuant to 26 U.S.C. § 7482(a).

### B. The Conrail–Armstrong Safe–Harbor Leasing Agreements

The Tax Court's findings of historical fact are, with one exception, undisputed. In December 1981, Armstrong entered into nine agreements with Conrail, whereby Armstrong agreed to purchase railroad properties with a $96 million total basis and to lease them back to Conrail pursuant to the safe-harbor leasing rules.[4] The agreements, only six of which are involved in this dispute, were either dated "as of December 17, 1981" or "as of December 31, 1981." Of those six, three transferred additions and improvements to Conrail's physical plant (the "A & I agreements"), and three transferred track replacement structures. Although the agreements provided for Armstrong to make payments of principal and interest to Conrail, and for Conrail to make rental payments to Armstrong, those payments were not made. Rather, in return for the tax benefits, Armstrong made wire transfer payments to Conrail on December 17 and 31, 1981, in the respective amounts of $19,006,523.86 and $15,738,726.14.

### 1. Properties Subject to the A & I Safe–Harbor Leasing Agreements

Each of the three A & I leasing agreements covered an assortment of properties culled from the four Conrail projects we discuss below as well as from other projects not relevant here. For example, the $16,500,000 A & I agreement[5] transferred properties from the Olean, Oak Island, and Allentown projects.

In order to satisfy the safe-harbor provisions of the Code, the transferred property must have been "placed in service" within the three-month period prior to the date of the tax benefit transfer transaction. Un-

---

**2.** Armstrong filed its return in conformity with the regulations even though it now contends they were invalid. According to Armstrong's brief, Conrail must indemnify Armstrong if the Tax Court's decision is not reversed, and any monies refunded as a result of the success of the $20 million claim would be "shared" with Conrail.

**3.** Although the Tax Court found that some of the properties had been transferred in accordance with Section 168(f)(8), the parties agreed to maintain the Commissioner's original deficiency figure, and they attached a stipulation to the Tax Court's final order, stating that "the foregoing decision [finding a $5 million deficiency] is in accordance with the opinion of the court, and the parties' computation."

**4.** Armstrong is a Pennsylvania corporation which manufactures and sells floor coverings and other products. Conrail, also incorporated in Pennsylvania, provides rail service throughout the Northeast and Midwest United States and was launched by Congress in 1976 as a for-profit corporation to operate the rail properties of a number of bankrupt railroads. Although Conrail sustained net operating losses through 1981, it ultimately became profitable, and the United States sold its common stock interest to the public in 1987. Conrail Privatization Act, Pub.L. No. 99–509, 100 Stat. 1892 (1986).

**5.** This sum refers to the total bases of the properties involved, not to the amount actually paid by Armstrong for the related tax benefits.

der Temp.Treas.Reg. § 5C.168(f)(8)–6(b)(2) property was "placed in service" when "placed in a condition or state of readiness and availability for a specifically assigned function." Thus, properties included in the December 17, 1981 A & I agreement should have been placed in service no earlier than September 16, 1981, and properties included in the December 31, 1981 A & I agreements should have been placed in service no earlier than September 30, 1981.[6] We will summarize the Tax Court's findings relevant to the determination of the placed in service dates. 62 T.C.M. (CCH) at 150–154.

### a. The Orrville to Colsan Traffic Control System

#### i. The Project

In the late 1970's, Conrail experienced congestion and delays in the movement of trains on the Pittsburgh to Chicago main rail line between Orrville and Colsan, Ohio. This line consisted of 76 miles of two parallel tracks on each of which trains could be operated in only one direction. The various interlockings[7] along the route were controlled by human operators stationed in towers. The operators watched for oncoming trains, flashed the appropriate signals to them, and manipulated the interlockings to ensure that each train was routed onto the appropriate track or siding. The instructions for aligning the track for each train were given to each operator verbally by another dispatcher at a distant location.

On April 12, 1977, Conrail's board of directors approved construction of a $12.9 million traffic control system ("TCS") to eliminate delays between Colsan and Orrville by permitting two-way movement of trains on each of the parallel tracks. The TCS was to be governed by a computer in Youngstown, Ohio, which would allow an operator to control the trains and track switches by remote control, and would generally eliminate the need for human operators stationed along the line. In addition,

once the entire TCS was completed, the computer would be able to prioritize the movement of trains along the track. The computer was installed and began operation in 1980.

The TCS was constructed in 11 geographic segments. When new signals, track work, and computer wiring were completed in a segment, the segment was "cut over," i.e., turned over by construction personnel to local crews for actual train operation. Each completed segment was then permanently connected to previously completed segments and temporary wiring to unreconstructed segments was installed. The newly completed segment was remotely controlled from Youngstown.

Ten of the 11 segments of the Orrville to Colsan TCS were cut over to local train crews for actual train operation prior to September 1981—the first segment in March 1979, and the tenth in May 1981. The 11th segment was cut over on October 26, 1981.

#### ii. The Tax Court's Findings

Although Conrail considered the entire project to be placed in service on the date that the last segment was cut over and the computer could prioritize the train traffic, the court determined that, because each segment became fully functional in the intended manner when it was cut over, the segments were placed in service on their respective cut over dates. Therefore, the court held that only the 11th segment had been placed in service within the three-month window. However, the court also recognized that, although the computer system had the capacity to throw switches and change signals by remote control, it could not make prioritizing decisions along the entire route until the final segment had been cut over. Thus, the court treated the computer as a separate project placed in

---

6. The September 16, 1981, and September 30, 1981, dates were used by the Tax Court. 62 T.C.M. (CCH) at 160. It is possible that the correct dates were September 17, 1981, and Oc-

tober 1, 1981, but even if this is so our result would not change.

7. Interlockings are the connections between the main tracks and sidings.

service within the three-month window.[8]

### b. *The Allentown Yard Project*
#### i. The Project

Prior to 1978, Conrail owned two deteriorated "hump" rail classification yards in Allentown, Pennsylvania. A rail classification yard receives incoming trains, re-sorts the cars into new outgoing trains, and sends new trains out of the yard. In a "hump yard," trains are uncoupled at the crest of an artificial hump or hill, and the cars are then routed onto the appropriate track as they descend into the yard. Each car as descending is braked by retarders built into the track.

On June 13, 1978, Conrail's board of directors approved a $13 million project to eliminate one of the Allentown yards and expand the other. One component of the project, an automated hump control system, was installed by SAB Harmon Industries, Inc. ("Harmon"). The hump control system was first tested and put into operation in January 1981. The system, however, had several problems which Harmon corrected.

In November 1981, Harmon personnel made two hardware and software changes to the hump control system—one to enable relays to operate fewer times, making the retarders close fewer times, and another to compensate for the temperature so that the cars would be released more quickly in cold weather and more slowly in hot weather. The changes were "enhancements" to the design of the system and were not part of the original specifications. After November 1981, the system underwent only routine maintenance.

#### ii. The Tax Court's Findings

In order to fix the placed in service date within the three-month window, Armstrong argued, and maintains on appeal, that "the expedited train movements originally intended by Conrail were possible only when the hump controls were corrected in November, 1981," and therefore that the en-

tire project was placed in service in that month. However, the Tax Court found that the November changes were enhancements—design changes not in the original specifications—and that the originally intended function had been attained, and the project placed in service, in January 1981.

### c. *The Oak Island Yard Project*
#### i. The Project

In January 1980, Conrail's board of directors approved a $10.6 million project to replace the three pre-existing rail classification yards in the area of Oak Island, New Jersey, with a single, modernized yard. The new yard project included a hump control system nearly identical to the one in the Allentown yard. Harmon installed the system in July 1981, corrected operational problems, and completed its hardware and software modifications by September 10, 1981. Although Harmon made a further adjustment in November 1981, the parties dispute its significance.

#### ii. The Factual Dispute and the Tax Court's Findings

The only dispute of historical fact in this case involves an adjustment to the Oak Island computer system made by Harmon employees in November 1981. Although the Tax Court found that the adjustment merely eliminated a paper jam in the console typewriter or printer, Armstrong argues that the problem was much more serious. It contends that the paper jam was caused by a software defect which at times forced the entire hump control system to shut down. It therefore argues that the project should have been deemed placed in service only after that adjustment. The Tax Court, however, found that the "adjustment did not affect the specific function of the unit." 62 T.C.M. (CCH) at 161. The court also found that the yard itself was operated during the course of construction and that portions of the yard were used both before and after the construction work. The court therefore deter-

---

8. The Tax Court denied Armstrong's post-decision motion to make a *post hoc* reconstruction

of the costs attributable to these components.

mined that the entire Oak Island project had been placed in service on September 10, 1981, a date just outside the three-month window.

#### d. *The Olean Yard Project*
##### i. The Project

In 1979 and 1981, Conrail's board of directors approved an $11 million project to construct, *inter alia*, a new rail classification yard in Olean, New York, near two major rail lines, and to install a traffic control system on a 20-mile stretch of track adjacent to the yard. Previously, a train using the Olean yard would enter or leave the yard with the help of railroad employees manually operating hand switches. Automation of those switches was essential to the operation of the new Olean yard.

Construction of the new yard was completed in 1980, and the TCS was completed and cut over in four geographic track segments. Two segments were cut over prior to May 1981, a third, between West Olean and Olean, was cut over on December 17, 1981, and the last segment was cut over in March 1982.

In addition, certain Conrail employees testified that automation of the switches and signals connecting the yard with the two main lines occurred in December 1981, at or near the time of the completion of the West Olean–Olean segment. Thus, until that time, trains still entered the yard by manual switches.

##### ii. The Tax Court's Findings

The Tax Court viewed the project as having five separate and independent components: the yard, and the four track segments. Because the yard was completed in 1980, and three of the four TCS segments were cut over outside of the three-month window, the Tax Court determined that only the West Olean–Olean segment had been placed in service during the appropriate time period. The court did not discuss the testimony concerning the date that remote-controlled entry into the new yard

became possible, but it may have considered that function as an element of the West Olean–Olean component. However, Conrail contends that the entire project was placed in service in December, when the entrance from the major rail lines into the new yard was automated.

#### 2. The $16,500,000 A & I Agreement

The Tax Court also found that the $16,500,000 A & I leasing agreement, which covered a selection of properties from the Oak Island, Allentown, and Olean projects, was not enforceable in 1981.[9] This finding provides the court's sole basis for disallowing the tax benefits related to the West Olean–Olean track segment, which the court found had been placed in service within the three-month window.

The $16,500,000 agreement, like all of the Armstrong–Conrail A & I leasing agreements, consisted of three documents: the main agreement, which contained the substantive provisions and noted the total value of the bases of the subject properties; an "Exhibit A," which described the subject properties as "all of the Additions and Improvements in respect of the property described in the Supplement to this Exhibit"; and the supplement to Exhibit A, which actually identified the properties. However, the supplement to Exhibit A of the $16,500,000 agreement was not attached when the agreement was executed on December 31, 1981, and was not prepared before January 19, 1982.

Because Conrail had more 1981 fourth quarter tax benefits than it actually sold to Armstrong, the Tax Court concluded that Conrail's commitment to sell a dollar amount of tax benefits to Armstrong, without specifically identifying the properties from which those benefits flowed, was simply an unenforceable "agreement to agree." The court rejected the argument that it was improperly requiring the safe-harbor lease to comply with state law for-

---

**9.** The agreement apparently covered most of the Olean improvements, some of the Allentown and Oak Island improvements, and a number of other projects.

malities;[10] rather, the court stated that the issue was "whether a binding agreement could occur in 1981 without specification between the parties as to the subject of the agreement." 62 T.C.M. (CCH) at 162. In other words, the question before the court was not whether the agreement to transfer title to the properties had satisfied state law transfer requirements, which was clearly unnecessary, but whether the agreement to transfer tax benefits had satisfied the Internal Revenue Code.

Because the parties did not identify the properties in 1981, the court held that they had not entered into a valid safe-harbor lease in that year. *Id.* Consequently, the court concluded that Armstrong was not entitled to the tax benefits transferred by the $16,500,000 agreement, even if the properties involved had been placed in service within the requisite three-month window.

3. Overview of the Dispute Surrounding the Track Replacement Leasing Agreements

In the final quarter of 1981, Conrail placed in service $50,973,247 of "Replacement–Retirement–Betterment ('RRB') replacement property"[11] which Conrail sold to Armstrong under three of the December 1981 safe-harbor leasing agreements. Armstrong then took depreciation deductions with respect to that property using a five-year recovery period beginning in 1981. In doing so, Armstrong was following treasury regulations that precluded the safe-harbor lessor of RRB replacement property from electing the one-year recovery period provided for such property in Section 168(f)(3) of the Code. Conrail had used the RRB method of depreciation for its track replacement properties, and therefore Armstrong contends that Conrail expected to transfer its consequent right to a one-year recovery period when it sold the

properties to Armstrong. However, Armstrong had never used the RRB method of depreciation, and the treasury regulations clearly prohibited it from taking advantage of the one-year recovery period for RRB replacement property acquired under a safe-harbor lease.

Armstrong argues that it has overpaid its 1981 taxes by $20 million, because it was entitled to deduct the $50 million cost of the track replacement properties entirely in 1981, instead of depreciating it over five years. It urges that the treasury regulations are contrary to the plain language of the Code, which arguably permits any owner to elect a one-year recovery period for the cost of RRB replacement property. However, the Tax Court upheld the validity of the treasury regulations and therefore rejected Armstrong's claim of overpayment, finding that Armstrong was not entitled to the one-year depreciation period because Armstrong had never used the RRB method of depreciation. We discuss the regulations in detail below.

## II.

### STANDARDS OF REVIEW

■ We review a decision of the Tax Court as we would a non-jury district court decision. 26 U.S.C. § 7482(a); *Commissioner v. Duberstein,* 363 U.S. 278, 290–91, 80 S.Ct. 1190, 1199–1200, 4 L.Ed.2d 1218 (1960). Thus, we review the one disputed historical factual finding, involving the Oak Island Project, under the clearly erroneous standard of Fed.R.Civ.P. 52(a). We also apply that standard with regard to the Tax Court's determination of the dates that the leased properties were "placed in service." *See Pleasant Summit Land Corp. v. Commissioner,* 863 F.2d 263, 268 (3d Cir.1988), *cert. denied,* 493 U.S. 901, 110 S.Ct. 260, 107 L.Ed.2d 210 (1989).[12] It is a question

---

**10.** Temporary treasury regulations stated that safe-harbor leases need not comply with state law requirements "concerning transfer of title, recording, etc." Section 5c.168(f)(8)–1(c), Temp.Income Tax Regs., 46 Fed.Reg. 51908 (Oct. 23, 1981).

**11.** *See* Section 168(f)(3). "RRB" refers to a method of depreciation formerly used by common carrier railroads to account for their track structure properties. *See* discussion section III C1, *infra.*

**12.** We apply this standard even if the Tax Court's determination was of an "ultimate fact."

of fact whether the Allentown and Oak Island projects were ready and available for specifically assigned functions within the three-month window or whether the cut over date for each track segment in the Olean and Orrville to Colsan projects was the date that the segment was "placed in service."

■ We note, however, that there is a legal aspect to the Tax Court's decision with respect to the Olean and Orrville to Colsan projects. The court interpreted the Code and case law in concluding that the components of those projects could be deemed separate "properties" independently placed in service on dates prior to the completion of the larger projects. Although we apply the clearly erroneous standard to the Tax Court's findings that the components were independently functional units placed in service on particular dates, we exercise plenary review over the court's decision to view each component as a separate property.

■ The second issue, which concerns the validity of the $16,500,000 agreement, involves a determination of the requirements of the Code. This is therefore a question of statutory construction which we review *de novo*. *See Pleasant Summit*, 863 F.2d at 268.

In determining the validity of the treasury regulations in the third and final issue on appeal, we exercise plenary review over the Tax Court's decision, and we must be guided by the standards set by the Supreme Court. *See generally Sacred Heart Medical Center v. Sullivan*, 958 F.2d 537, 543–44 (3d Cir.1992). We must first look to see if "Congress has directly spoken to the precise question at issue," and if the intent of Congress is unambiguously expressed, we must give that intent effect. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2780–83, 81 L.Ed.2d 694 (1984). If the question has not been directly addressed, we then look to whether "the agency's answer is based on a permissible

construction of the statute." *Id.* at 843, 104 S.Ct. at 2782.

Additionally we defer to treasury regulations that "implement the congressional mandate in some reasonable manner." *United States v. Correll*, 389 U.S. 299, 307, 88 S.Ct. 445, 450, 19 L.Ed.2d 537 (1967). *Accord Commissioner v. Portland Cement Co.*, 450 U.S. 156, 169, 101 S.Ct. 1037, 1045, 67 L.Ed.2d 140 (1981). In other words, such regulations "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes." *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948). *Accord Portland Cement*, 450 U.S. at 169, 101 S.Ct. at 1045 ("These regulations command our respect, for Congress has delegated to the Secretary of the Treasury, not to this Court, the task 'of administering the tax laws of the Nation.'") (citation omitted).

Moreover, legislative regulations not promulgated under the general authority to "prescribe all needful rules and regulations," 26 U.S.C. § 7805(a), but instead emanating from a specific grant of Congressional authority "to define a statutory term or prescribe a method of executing a statutory provision," *Rowan Cos. v. United States*, 452 U.S. 247, 253, 101 S.Ct. 2288, 2292, 68 L.Ed.2d 814 (1981), are owed an even greater deference. *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 24, 102 S.Ct. 821, 827, 70 L.Ed.2d 792 (1982). Where the regulation is enacted under specific authority, a court may set it aside only if the "Secretary exceeded his statutory authority or if the regulation is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Batterton v. Francis*, 432 U.S. 416, 426, 97 S.Ct. 2399, 2406, 53 L.Ed.2d 448 (1977) (citation omitted). *Accord Rowan*, 452 U.S. at 252, 101 S.Ct. at 2292.

Two of the three regulations at issue (the "1981" regulations) were promulgated under the specific grant of authority found in Code Section 168(f)(8)(G), which reads:

*Pleasant Summit,* 863 F.2d at 268. We note, however, that even if we exercised plenary review on the placed in service issue our result would be the same.

The Secretary shall prescribe such regulations as may be necessary to carry out the purposes of this paragraph, including (but not limited to) regulations consistent with such purposes which limit the aggregate amount of (and timing of) deductions and credits in respect of qualified leased property to the aggregate amount (and the timing) allowable without regard to this paragraph.

*See* T.D. 7791, 1981–2 C.B. 66 (introducing the 1981 regulations) ("These regulations contain certain rules promulgated under the authority of section 168(f)(8)(G)"). The 1981 regulations are therefore entitled to a higher standard of deference. The third regulation (the "1986" regulation) was merely an interpretive regulation, promulgated under general rule-making authority, and is therefore entitled to less deference. However, we must respect it if it is a reasonable interpretation of the Code.

## III.

### DISCUSSION

A. Determination of the Placed in Service Dates

In the Economic Recovery Tax Act of 1981, Pub.L. 97–34, 95 Stat. 172 ("ERTA"), Congress replaced traditional methods of depreciation with the Accelerated Cost Recovery System ("ACRS"), which reduced the depreciation periods for most tangible property. *See* Section 168(a)–168(i). At the same time, Congress also enacted the safe-harbor leasing rules of Section 168(f)(8), under which a sale-leaseback transaction could be crafted to transfer tax benefits from one taxpayer to another. *See also* Section 168(f)(8)(B)(i) (containing restrictions on the identity of the safe-harbor lessor). According to ERTA's legislative history, the Senate Committee believed that "ACRS will provide the greatest bene-

fit to the economy if ACRS deductions and investment tax credits are more easily distributed throughout the corporate sector," and the safe-harbor leasing provisions were enacted to accomplish this goal.[13]

Section 168(f)(8) set forth the requirements for a valid safe-harbor lease.[14] Generally, Section 168(f)(8) provided that an "agreement with respect to qualified leased property" would be treated for federal tax purposes as a true sale and leaseback, if all the parties characterized it as a lease and elected to have the provisions of Section 168(f)(8) apply. The lease would "transfer" the property to a profitable corporation so that it, as fictional "owner," would become entitled to the tax benefits associated with the property. The new "owner-lessor" would "lease" the property back to the "seller-lessee," and, in return for the tax benefits, would provide the troubled taxpayer with appropriate and welcome compensation. "Qualified leased property" was defined, as relevant here, as:

(ii) property—

(I) which was new section 38 property[15] of the lessee,

(II) which was *leased within 3 months after such property was placed in service by the lessee,* and

(III) with respect to which the adjusted basis of the lessor does not exceed the adjusted basis of the lessee at the time of the lease

. . . .

Section 168(f)(8)(D)(ii) (emphasis added).

Under Section 5c.168(f)(8)–6(b)(2)(i), Temp.Income Tax Regs., property is considered "placed in service" for purposes of the safe-harbor leasing rules "at the time the property is placed in a condition or state of readiness and availability for a specifically assigned function." *See also* Sections 1.167(a)–11(e)(1)(i) and 1.46–

---

13. *See* S.Rep. No. 97–144, 97th Cong., 1st Sess. 61–62 (1981), *reprinted in* 1981 U.S.C.C.A.N. 166–67 ("The committee has decided to facilitate the transfer of ACRS benefits through [safe-harbor leasing transactions.]").

14. The parties do not dispute that the requirements of a valid safe-harbor lease have been met except as we discuss in this opinion.

15. "New section 38 property" is generally section 38 property the original use of which commences with the taxpayer. *See* Code Section 48(b). Section 38 property includes tangible property "used as an integral part of ... furnishing transportation." Code Section 48(a)(1)(B)(i).

3(d)(1)(ii) (defining "placed in service" in essentially identical manner for purposes of depreciation and investment credit provisions of the Code). Regulation Section 5c.168(f)(8)–6(b)(2)(i) further sets forth the "facility rule," which provides that, "[i]f an entire facility is leased under one lease, property which is part of the facility will not be considered placed in service under this rule until the entire facility is placed in service."

Three A & I safe-harbor leasing agreements between Armstrong and Conrail, in which Conrail transferred tax benefits associated with the properties from the four rail construction or reconstruction projects described above, are at issue here. The Tax Court split two of the projects into independent components, and found that the majority of the components transferred in the transactions had not been "placed in service" within three months of the transaction dates. The court made detailed findings and Armstrong, with one exception involving the Oak Island Yard project, does not dispute the historical facts on which they were predicated. It argues instead that each rail project was a single property placed in service within the three-month period and that the court erred by treating the components as separate properties when Conrail had envisioned otherwise.

The facility rule, which might have been useful here, is not because of the way the transactions were structured. Thus, the Tax Court found that the facility rule was inapplicable because Armstrong had admitted that it had not leased each project under a single lease. Moreover, Armstrong does not now argue that the projects should have been considered to be "facilities" under the facility rule; it only contends that we must defer to Conrail's view of each project as a set of interdependent parts.

This appeal raises issues of first impression for this court. Furthermore, we are not aware of any case in any court which deals with the precise issue before us, *i.e.*, whether a court may treat a project as a set of independent components, each separately placed in service, when the party investing in the project deems it to be one property under the safe-harbor leasing rules. However, a number of courts have agreed in other contexts that component assets constitute a single property when those components have no independent utility in the taxpayer's trade or business prior to the time that all of the components are completed and available for use in the intended manner.[16]

For example, *Consumers Power Co. v. Commissioner*, 89 T.C. 710 (1987), dealt with the issue of when a hydroelectric plant had been placed in service for purposes of depreciation and investment credit provisions. The plant consisted of a number of components, including an electricity generating station, a water-pumping mechanism, and an upper reservoir, into which water was pumped from the lower, natural body of water. *Id.* at 716–17. Construction of the plant began in 1969 and, in 1972, the taxpayer received final approval from the Federal Power Commission to fill the upper reservoir and begin regular operation of the plant, subject to the necessary preoperational testing. *Id.* at 717.

From October 1972 through December 7, 1972, as part of preoperational testing, Unit 1, the unit at issue, began pumping water into the reservoir. *Id.* at 717–18. On November 18, 1972, the generating component of the unit was activated and generated electrical power through December 5, 1972, still as part of preoperational testing. *Id.* at 718–19. Most of that power was sold to the taxpayer's customers. *Id.* at 719. By December 7, 1972, a number of the preoperational tests remained to be

---

**16.** This case is unusual as ordinarily the taxpayer rather than the Commissioner argues in favor of the earlier placed in service date to obtain earlier tax advantages. This case is also unusual as the leases have no economic substance beyond their tax consequences. *See Lerman v.*

*Commissioner*, 939 F.2d 44, 45 (3d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 590, 116 L.Ed.2d 615 (1991). What unfortunately may not be unusual in the case is that even the sophisticated taxpayer here had difficulties complying with the intricacies of the Internal Revenue Code.

completed, but due to a mechanical failure the unit was shut down. *Id.* On January 9, repairs were completed and preoperational testing was resumed. *Id.* On January 17, 1973, testing of Unit 1 was completed, and it was formally accepted from the general contractor. *Id.* On January 18, 1973, electrical power from Unit 1 became available for transmission to the public on the basis originally envisioned. *Id.*

The taxpayer argued that the unit had been placed in service in 1972, when it first generated electricity, so that the taxpayer should have been allowed a depreciation deduction and an investment credit for that year. *Id.* at 723. In finding that the unit had not been placed in service in 1972, but in 1973, the court reasoned as follows:

> Although unit 1 pumped water into the reservoir and generated electrical power during preoperational testing in 1972, unit 1 was not available in 1972 to provide electrical power on a regular basis in 1972.... Not until January 17, 1973, after unit 1 successfully had completed all phases of preoperational testing, thereby demonstrating that it was available for service on a regular basis, was the unit in a state of readiness and availability for its specifically assigned function....

*Id.* at 724.

The taxpayer alternatively argued that the Tax Court could find that the upper reservoir was a separate asset and that the reservoir had been placed in service in 1972 because it was complete and available for use at that time. *Id.* at 726. The court initially responded that neither the statute nor the regulations specifically addressed what is to be regarded as a single property for purposes of depreciation deductions and investment credit. However, the court found a solution in case law and, citing to *Public Service Co. v. United States,* 431 F.2d 980 (10th Cir.1970), and *Hawaiian Independent Refinery, Inc. v. United States,* 697 F.2d 1063 (Fed.Cir.), *cert. denied,* 464 U.S. 816, 104 S.Ct. 73, 78 L.Ed.2d 86 (1983), concluded that the plant "must be viewed as one integrated unit because the physical plant and the reservoir operate simultaneously and as a unit in order to produce electrical power." 89 T.C. at 726.

The Court of Appeals for the Tenth Circuit in *Public Service Co. v. United States* implicitly considered whether component assets of an electric power plant could be treated as placed in service separately for investment credit purposes. 431 F.2d at 983–84. The component assets included a turbine generator, a steam-generating unit, a cooling tower, a transformer, and a main power plant building. *Id.* at 982. The court found that the components could not be considered separately, because no one of them "would serve any useful purpose ... but all of them properly fitted together by the contractor ... constituted a complete unit which was operational and served the purpose intended by the [taxpayer]." *Id.* at 984.

In *Hawaiian Independent Refinery v. United States* the Court of Appeals for the Federal Circuit considered whether an oil refinery complex had been "constructed" for investment credit purposes within the statutory time period allowing the credit. 697 F.2d at 1064. The oil refinery complex had two separate offsite components which the taxpayer argued should be considered separately in determining whether any part of the complex had been constructed after the specified period. The offsite components were an offshore tanker-mooring facility connected to the refinery by two miles of pipeline and a set of pipelines used to transport finished products from the refinery to various storage facilities. *Id.* at 1069. The court agreed with the trial court, finding that the offsite components, together with the refinery, " 'functionally form[ed] a single property,' construction of which began when construction was begun on the refinery component." *Id.* The court therefore considered the entire complex as one integrated unit for investment credit purposes.

Similarly, the Tax Court in *Siskiyou Communications, Inc. v. Commissioner,* 60 T.C.M. (CCH) 475 (1990), cited to *Hawaiian Independent Refinery, Consumers Power,* and *Public Service Co.,* in determining that a telephone system had only

been placed in service for investment credit and depreciation purposes once all the component parts had become capable of their intended use and the employees had been trained to operate the system. *Id.* at 478–79. The court found that, even though certain component parts were on the premises and could perform their separate functions in 1984, the system had been placed in service in 1985, when the employees had finished their training and the technicians had completed a wiring process which connected the components to the customer lines and permitted the intended "regular use" of the system for customer calls. *Id.* at 478. Until that time, customers were unable to use the new system.

In sum, courts appear to agree that individual components will be considered as a single property for tax purposes when the component parts are functionally interdependent—when each component is essential to the operation of the project as a whole and cannot be used separately to any effect. The converse, thus, should be equally valid in this case. Accordingly, if a project has component parts which can function as planned in a wholly *independent* manner, then a court may find that each component is a "property ... placed in a condition or state of readiness and availability for a specifically assigned function." *Consumers Power*, 89 T.C. at 723.

Furthermore, the existence of the "facility rule" for those facilities transferred in a single lease implies that, when a facility is not transferred in a single lease, component "parts" may be considered as placed in service as each part reaches a state of readiness and availability for its assigned function.[17] Because the parties agreed that the facility rule did not apply in the case before us, the Tax Court reasonably applied the implied mandate and separated the independent component parts.

Cases also instruct that property is placed in service when ready for regular income-producing use. In *Oglethorpe Power Corp. v. Commissioner*, 60 T.C.M.

(CCH) 850 (1990), the only relevant case to address the meaning of "placed in service" for safe-harbor leasing purposes, the Tax Court found that an electricity generating unit was not placed in service until major problems with the system, discovered during the necessary testing period, were corrected and the property was "declared in commercial operation on a regular basis." *Id.* at 858. The court rejected the argument that the unit was placed in service when it was first activated, because the unit could only be tested as a fully assembled unit after activation, and the "major operational defects" found during the testing period could not have been discovered without testing. *Id.* at 859. The court found that the unit was being operated "solely for start-up testing purposes," and it found that it could only have been considered as placed in service after that testing had ended. *Id.* at 862. However, the court distinguished "testing to eliminate remaining defects," and concluded that such testing could take place after the placed in service date. *Id.* See also *Consumers Power*, 89 T.C. at 724 (unit was placed in service when "available ... to provide electrical power on a regular basis"); *Siskiyou*, 60 T.C.M. (CCH) at 478 (it was "not possible" to introduce the new system to the customers until 1985); *Noell v. Commissioner*, 66 T.C. 718 (1976) (new airport runway was not placed in service until paved and available for regular use, despite occasional risk-filled use prior to such time).

Applying these principles recognized in the above cases, the Tax Court in this case found that two of the projects could be separated into independently functioning sub-projects and that most of those sub-projects had not been placed in service within the three-month window. It also found that the properties from the remaining two projects were placed in service on the dates that they were first used regularly for their originally intended purposes.

---

**17.** The rule states that when an entire facility is leased under one lease, "property which is part of the facility will not be considered placed in service under this rule until the entire facility is placed in service." We note that, although Armstrong does not and cannot argue in this appeal that the facility rule applies, it desires us to reach the same result.

We agree with the Tax Court's analysis and its conclusion that the "placed in service" test is an objective and not subjective one, and we will now briefly review the court's findings regarding each of the four projects.

■ The Tax Court separated the Orrville to Colsan project into 12 parts: the 11 track segments and the computer system. Because each of the track segments became ready and available for its assigned function when it was cut over, it was correctly deemed placed in service at that time. As of its cut over date, each segment was fully attached to the computer system and as a result each was completely controlled from a remote location. No further work needed to be done on the track segment after that time, and the segments were used by Conrail as intended after the cut over date. Unlike the component parts of the projects at issue in *Consumers Power, Siskiyou, Hawaiian Independent Refinery,* and *Public Service Co.,* the track segments had independent utility prior to the time all of the project components were completed and available for use.

Thus, the finding of the Tax Court that only the 11th segment had been placed in service at the appropriate time was not clearly erroneous. Moreover, we agree with the Tax Court that the computer, which could not perform the "specifically assigned function" of prioritizing the routes until all the segments had been completed, was placed in service in December 1981, within the three-month window. But the remaining ten track segments were not placed in service within the three-month window as is necessary for a valid safe-harbor lease.

The Allentown project was also placed in service outside the three-month window. The hump control system was functioning as originally designed in January 1981, and was used on a regular basis by Conrail beginning in that month. The two design changes made in November 1981, which were not part of the original plans, did not alter the fact that the system had already been performing its "specifically assigned function" in previous months. In effect,

Armstrong's argument is that any taxpayer may complete a project and set it in motion, only to implement a new design plan months later and claim a later placed in service date. This argument is untenable, for it would permit unlimited flexibility in the placed in service date, and there is nothing in the Code or case law to suggest that such a policy is merited. Rather, the case law suggests that determination of the placed in service date is not based on the taxpayer's desires but on the actual availability for regular, originally scheduled operation. *See Siskiyou,* 60 T.C.M. (CCH) at 479; *Consumers Power,* 89 T.C. at 724. We therefore find no error in the Tax Court's holding that the Allentown project was placed in service before the enhancements in November and outside the three-month window.

■ In evaluating the Tax Court's decision with respect to the Oak Island project, we note first that the court was not clearly erroneous in finding that the November adjustment merely entailed the elimination of a paper jam in the computer console, or "electronic typewriter." The Harmon technician who made the adjustment testified that the November change was made "to keep the paper from jamming on the console typewriter." App. at 98. He also indicated that it was only chance that the paper jammed on the day that he was at the Oak Island yard overlooking the system's operation. App. at 98–99. There was no evidence that the paper jam occurred on any other occasion.

Although the paper jam may have temporarily stalled the computer system, it is unreasonable to assume that a computer must be free from glitches in order to be considered placed in service. As the Tax Court commented in *Oglethorpe,* a court may declare a system to be "placed in service" even if the taxpayer must perform testing to eliminate remaining defects which appear after the date that the system is put to use on a regular basis. 60 T.C.M. (CCH) at 862. The Tax Court here correctly determined that a single paper jam, which cropped up after the system had been functioning as originally planned,

did not affect the placed in service date. We therefore agree with the Tax Court's finding that the Oak Island system was ready and available for its assigned function on a date prior to the three-month window.

The Tax Court evaluated the Olean project as it did the Orrville to Colsan project, and it deemed the track segments to have been placed in service according to their cut over dates. As we agree with this conclusion for the reasons already stated, it was obviously not clearly erroneous. When each track segment was cut over, it fulfilled its intended purpose on a regular basis, and three of the four segments were cut over outside the three-month window. Furthermore, the reconstructed yard was in daily operation after 1980. These independently functional components were therefore not placed in service during the necessary period. Thus, only the West Olean–Olean track segment, which was cut over during the three-month period, could have been properly transferred by a December 1981 safe-harbor lease.[18]

## B. Validity of the $16,500,000 Agreement

As an additional basis for disallowing the deductions and investment credits with respect to the Allentown and Oak Island projects and those components of the Olean project that were placed in service outside the three-month window, the Tax Court held that the $16,500,000 A & I agreement, which purported to transfer those properties, was not valid in 1981. This holding also formed the sole basis for the disallowance of deductions and investment credit with respect to that segment of the Olean project that the Tax Court found to be placed in service during the appropriate time period.

The $16,500,000 agreement, which attempted to transfer $16,500,000 of Con-

rail's property under the safe-harbor leasing rules of Section 168(f)(8), was executed on December 31, 1981, and Armstrong sent its payment under the agreement by wire transfer to Conrail on that same day. However, the supplement, which actually identified the physical properties being transferred, was not attached to the agreement when it was executed and was not prepared until January 19, 1982. Thus, as of December 31, 1981, the agreement identified only the total monetary value of the bases of the subject properties, and the Tax Court held that, absent the identification of the physical properties prior to the end of the year, the safe-harbor leasing agreement was not enforceable for any purpose.

The treasury regulations promulgated in 1981 clarify the requirements for a valid safe-harbor lease. "If all the requirements of section 168(f)(8) and [Regulation] §§ 5c.168(f)(8)–2 through 5c.168(f)(8)–11 are met, then the agreement shall be treated as a lease." Section 5c.168(f)(8)–1(a), T.D. 7791, 1981–2 C.B. 66, 67. *See also* Section 168(f)(8). The lessor will then be deemed to be the owner of the property and become entitled to the associated tax benefits. A lease that meets these requirements may be treated as a lease "for Federal tax law purposes only," and "[t]he agreements need not comply with State law requirements concerning transfer of title, recording, etc." Section 5c.168(f)(8)–1(c)(6).

In this second issue, only one requirement is in question. As we discussed previously, Code Section 168(f)(8) provides that the safe-harbor leasing rules apply "in the case of an agreement with respect to qualified leased property." Qualified leased property is defined in pertinent part in Section 168(f)(8)(D) as "recovery property" which is:

(i) new section 38 property [19] (as defined in section 48(b)) of the lessor which is leased within 3 months after such proper-

---

**18.** Although the automation of the yard entrance between the West Olean–Olean track segment and the yard apparently occurred in December 1981, we believe that the Tax Court implicitly, and correctly, found that cost of the automation of the West Olean–Olean entrance was included in the costs for work done on the West Olean–Olean segment. We reject Arm-

strong's argument that the entire track and yard reconstruction project was not placed in service until that single entrance was changed from hand control to remote control.

**19.** Whether the property is section 38 property is not at issue.

ty was placed in service and which, if acquired by the lessee, would have been new section 38 property of the lessee, [or]

(ii) property—

(I) which was new section 38 property of the lessee,

(II) which was leased within 3 months after such property was placed in service by the lessee, and

(III) with respect to which the adjusted basis of the lessor does not exceed the adjusted basis of the lessee at the time of the lease

. . . .

The Commissioner argues that because the $16,500,000 agreement did not upon execution contain an identification of the physical properties, it was not an "agreement with respect to qualified leased property." The Commissioner contends that the requirement of property identification is implicit in the Code language [20] and that, although the lease is in substance a fiction, the lessor and lessee must comply with this implicit condition.

Armstrong, however, argues that the Tax Court has improperly imposed a state law "identification" requirement on the safe-harbor leasing agreement, and essentially contends that identification of the leased properties need not be made until the filing of an information return reporting the safe-harbor transaction.[21] Armstrong further suggests that the Commissioner has no interest in having the properties identified at the time of the execution of the lease, but the Commissioner counters that "one of Congress' *primary* concerns in enacting § 168(f)(8) was to prevent a corporation from selling tax benefits with respect to property that was not 'new section 38 property' in 1981—that is, from attempting to qualify property acquired and used prior to 1981 for the tax benefit transfers that first became available in 1981." Brief at 36 (emphasis in original). The Commissioner is concerned that, even though the property may be identified in the next taxable year, as was the case here, the Internal Revenue Service would be unable to determine whether the requirements of Section 168(f)(8) were met as of the close of the year in which the tax benefits were claimed.[22]

Neither the Tax Court nor the parties cite to any case law in evaluating this issue. However, the plain language of the statute suggests that the Commissioner and the Tax Court are correct. Initially we point out that the Tax Court did not impose state law transfer requirements when it concluded that the properties should have been identified in the agreement. It is clear that an actual transfer of the properties is not required by the safe-harbor leasing provisions, and thus state law property transfer formalities are irrelevant to the validity of the lease. However, although the regulation stated that state law requirements, "concerning transfer of title, recording, etc.," need not be met, that language cannot support a conclusion that there need not even be a meeting of the minds at the time of the lease's execution with respect to the identity of the property. Reg.Section 5c.168(f)(8)–1(c)(6). The Tax Court decided this more fundamental question, and concluded that the *Code* required a safe-harbor leasing agreement to identify the properties at the time of the agreement's execution.

Armstrong argues that "agreement with respect to qualified leased property" does

---

**20.** There is no requirement in either the Code or the regulations that the agreement contain a description of the properties.

**21.** An information return detailing the safe-harbor leasing transaction must be filed with the Internal Revenue Service. Treas.Reg. § 5c.168(f)(8)–2(a). Armstrong asserts that it complied with this rule and identified the properties in that document, and the Commissioner does not dispute this fact.

**22.** The parties themselves may not have known on December 31, 1981, which properties were involved in the $16,500,000 agreement, as Conrail was aware that it had a number of projects on hand. The individual properties may have been chosen in January 1982 and added together to reach the quoted tax benefit figure. In this regard we observe that the Tax Court believed there was some evidence that someone had tampered with the Conrail documents which listed certain placed in service dates.

not mean that the agreement must specify which qualified leased property is involved. However, a common sense reading of the phrase indicates that the Code implicitly requires the agreement itself to provide a description of the property. The property's characteristics are at the heart of the agreement and are essential in a determination of the validity of the lease, inasmuch as the property must be "new section 38" property placed in service within a certain period of time. Section 168(f)(8)(D). The identification of the property simply cannot be irrelevant to the validity of the lease agreement.

Thus, the parties did not execute "an agreement with respect to qualified leased property" in 1981 when they executed the incomplete $16,500,000 agreement. Therefore, we accept the Tax Court's resolution of this issue, and find that the West Olean–Olean segment which was placed in service in the final quarter of 1981 was not properly transferred to Armstrong in a valid safe-harbor leasing agreement.

C. Validity of the Treasury Regulations

As we previously discussed, Armstrong claims an overpayment of its 1981 taxes in the amount of $20 million, arguing that the treasury regulations, which governed its transactions with Conrail, conflicted with the plain language of the Code. In 1981, Armstrong purchased approximately $50 million of track replacement properties [23] from Conrail under three safe-harbor leasing agreements, but the contested treasury regulations precluded Armstrong from deducting the entire amount in that same year. The Code, however, arguably permitted the deduction. Armstrong followed the regulations and was thus forced to take the depreciation deduction over a five-year period beginning in 1981. The contested regulations and Code sections are set out below.

23. The parties do not dispute that the track replacement properties were placed in service in the proper period.

24. The ACRS generally *shortened* the recovery period for most tangible depreciable property.

1. Code Section 168(f)(3) and Treas.Reg. § 1.168–5(a)(1)(ii) (The 1986 Regulation)

Before the enactment of ERTA, Code Section 167(r) permitted common carriers to compute depreciation on railroad track and related items using the Retirement–Replacement–Betterment method. Under the RRB method, the cost of new rail lines and the cost of improvements to existing lines were generally capitalized over a period of many years (*e.g.* 36 or 50 years), but the cost of *replacing* original rail lines ("replacement property") was deducted in the year of the expense. Conrail used the RRB method prior to 1981.

ERTA repealed Section 167(r), and replaced the traditional methods of depreciation with the Accelerated Cost Recovery System ("ACRS"), which permitted accelerated depreciation of most tangible property over 3 to 15–year periods, depending on the type of property. Under ACRS, all property that would have been depreciated under the RRB method under prior law was to be depreciated over a 5–year period. Section 168(a)–168(b).

However, to alleviate the hardship of the abrupt shift from the previous provision allowing recovery of RRB *replacement property* costs in the year of the expense, Congress enacted a transitional or "phase-in" rule in Section 168(f)(3) which allowed replacement property that would have been expensed under the RRB method to be phased in to the ACRS.[24] Under Section 168(f)(3), RRB replacement property placed in service in 1981 could be expensed in that year, and RRB replacement property placed in service in 1982, 1983, or 1984, could be recovered over a two, three, or four-year period, respectively. After 1984, the transitional rule gave way, and RRB replacement property had to be treated like other kinds of RRB property—as 5–year property under the new ACRS.

S.Rep. No. 97–144, 97th Cong., 1st Sess. 48 (1981), *reprinted in* 1981 U.S.C.C.A.N. 153. The new *increased* recovery period for RRB replacement property was therefore an exception to the new system.

Since the purpose of the transitional rule was to help taxpayers previously using the RRB method to adjust to the new system, RRB property was defined in Section 168(g)(6) for purposes of Section 168 as follows:

For purposes of this section, the term 'RRB Property' means property which under the taxpayer's method of depreciation *before January 1, 1981, would have been depreciated using the retirement-replacement-betterment method.*

(emphasis added).

In 1986, the Treasury Department published Reg. § 1.168–5 ("the 1986 Regulation"), which related to the phase-in rule and underscored the intent behind Code Sections 168(f)(3) and 168(g)(6). Section 1.168–5(a)(1)(ii) provided as follows:

The provisions of paragraph (a)(1)(i) of this section [relating to the transitional rule's 1, 2, 3, and 4–year recovery periods] *do not apply* to any taxpayer *who did not use the RRB method* of depreciation under section 167 as of December 31, 1980. In such case, RRB replacement property placed in service by the taxpayer after December 31, 1980, shall be treated as other 5–year recovery property under section 168.

(emphasis added).

It is undisputed that Armstrong, the taxpayer, did not use the RRB method of accounting as of December 31, 1980.

2. The 1981 Regulations and Section 168(f)(10)(B)(iii)

Congress enacted the safe-harbor leasing rules of Section 168(f)(8) so that the tax benefits provided by Section 168's new ACRS could be transferred from those corporations that could not use them to those that could.[25] In Section 168(f)(8)(G), Congress specifically authorized the Secretary of the Treasury to promulgate regulations to carry out the purposes of the safe-harbor leasing provisions.[26] Accordingly, the Secretary issued a number of regulations in 1981 governing safe-harbor leasing transactions, including the two regulations at issue here which relate in part to the leasing of RRB replacement property.

Temp.Treas.Reg. § 5c.168(f)(8)–5(c) provided, in pertinent part, that

In general, the determination of whether property is 3–year recovery property, 5–year recovery property, etc., in the hands of the lessor will be based on the characterization of the property in the hands of the owner as determined without regard to the section 168(f)(8) lease. Thus, for example, property which is public utility property or RRB replacement property absent the section 168(f)(8) lease will be characterized as such in the hands of the lessor for purposes of section 168(f)(8). *However, with respect to RRB replacement property, the transitional rule of section 168(f)(3) shall be inapplicable to the lessor.*

(emphasis added).

Similarly, Temp.Treas.Reg. § 5c.168(f)(8)–7(e) provided:

ACRS deductions. The deductions that the lessor is allowed under section 168(a) with respect to property subject to a section 168(f)(8) lease shall be determined *without regard to the limitation in section 168(f)(10)(B)(iii).* The recovery class of qualified leased property in the hands of the lessor shall be determined by the character of the property in the

---

**25.** "The committee recognizes that some businesses may not be able to use completely the increased cost recovery allowances and the increased investment credits available for recovery property under ACRS. ACRS will provide the greatest benefit to the economy if ACRS deductions and investment tax credits are more easily distributed throughout the corporate sector.... The committee has decided to facilitate the transfer of ACRS benefits through [safe-harbor leasing agreements]." S.Rep. No. 97–144, 97th Cong., 1st Sess. 61–62 (1981), *reprinted in* 1981 U.S.C.C.A.N. 166–67.

**26.** Section 168(f)(8)(G) states: "The Secretary shall prescribe such regulations as may be necessary to carry out the purposes of this paragraph, including (but not limited to) regulations consistent with such purposes which limit the aggregate amount of (and timing of) deductions and credits in respect of qualified leased property to the aggregate amount (and the timing) allowable without regard to this paragraph."

hands of the owner of the property without regard to section 168(f)(8). Any elections under section 168(b)(3) by the lessor with respect to the class of recovery property to which the qualified leased property is assigned shall apply to the leased property. *However, with respect to RRB replacement property, the transitional rule of section 168(f)(3) shall be inapplicable to the lessor.*

(emphasis added).

These two regulations clearly prohibited a party who purchased the tax benefits related to RRB replacement property from also gaining the special privilege accorded in Section 168(f)(3).

Although Armstrong depreciated the replacement property it "purchased" from Conrail over a five-year period in deference to these regulations, it now claims that it should have been able to recover the entire amount in 1981 because the regulations conflicted with the Code. It argues both that the transitional rule found in Code Section 168(f)(3) applied, despite the fact that it had never used the RRB method of depreciation, and that Code Section 168(f)(10)(B)(iii), cited *supra* in the text of Reg.Section 5c.168(f)(8)–7(e), mandated that a lessor in a sale-leaseback transaction be bound by the lessee's period and method of depreciation, including the lessee's right to the special transitional rule of section 168(f)(3). Section 168(f)(10)(B)(iii) of the Code provided in relevant part:

> (10) Transferee bound by transferor's period and method in certain cases.—
> (A) In general.—In the case of recovery property transferred in a transaction described in subparagraph (B), the transferee shall be treated as the transferor for purposes of computing the deduction allowable under subsection (a) with re-

spect to so much of the basis in the hands of the transferee as does not exceed the adjusted basis in the hands of the transferor.

> (B) Transfers covered.—The transactions described in this subparagraph are—
>
> . . . .
>
> (iii) an acquisition followed by a leaseback to the person from whom the property is acquired.

### 3. Analysis

■ Armstrong acknowledges that deduction of the full cost of the replacement properties in 1981 was barred by the 1981 and 1986 regulations, but it argues that the regulations were invalid. We must therefore first determine whether Congress has spoken to the precise question at issue and, if it has not, we must look to whether the 1981 regulations, which were promulgated under the specific grant of authority found in Section 168(f)(8)(G), are "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844, 104 S.Ct. at 2782; *Rowan*, 452 U.S. at 252, 101 S.Ct. at 2292; *Batterton v. Francis*, 432 U.S. at 426, 97 S.Ct. at 2406. We will uphold the 1986 regulation, promulgated under the Secretary's general authority, if it is a reasonable interpretation of legislative intent. *Portland Cement*, 450 U.S. at 169, 101 S.Ct. at 1045; *Correll*, 389 U.S. at 307, 88 S.Ct. at 450.

Congress did not clearly speak to the precise question at issue in this case, *i.e.*, whether the special benefits conferred in Code Section 168(f)(3)'s transitional rule may be transferred in a safe-harbor lease to a lessor-taxpayer who did not use the RRB recovery method prior to 1981.[27] Although Armstrong argues that Section 168(f)(3) [28] is mandatory for all taxpayers,

---

**27.** While the ERTA conference report states with regard to the new leasing provisions that "[t]he conferees intend that the amount and timing of cost recovery allowances in the hands of the lessor will be the same as they would have been in the hands of the lessee," this is a very general statement that does not necessarily speak to the narrow issue at hand: the transfer of tax benefits related to RRB replacement property. *See* H.Rep. No. 97–215, 97th Cong., 1st Sess. 218 (1981), *reprinted in* 1981

U.S.C.C.A.N. 309. Since the Code itself leaves the question before us unanswered, we must therefore follow the answer provided by the Secretary unless we are convinced that the regulations are improper.

**28.** Section 168(f)(3)(A) begins: "In the case of RRB replacement property placed in service before January 1, 1985, the recovery deduction for the taxable year shall be...." "RRB Replacement Property" is then defined in Section

it ignores Congress' general definition of RRB property in Section 168(g)(6), which necessarily qualifies Section 163(f)(3) and indicates that RRB property is only that property which would have been depreciated "under the taxpayer's method of depreciation before January 1, 1981" using the RRB method.[29] Section 168(g)(6). It is therefore not contrary to the Code to prevent a company which did not use the RRB method prior to January 1, 1981, from taking advantage of a special section relating to RRB property.

Armstrong also argues that Section 168(f)(10) requires that the safe-harbor lessor use the transitional rule if the safe-harbor lessee would have been entitled to elect its benefits.[30] However, the Commissioner and Armstrong agree that the purpose of Section 168(f)(10) was to prevent certain transferees from obtaining ACRS deductions *in excess of* the deductions to which the transferor would have been entitled. Its purpose was not to force an *increase* in the amount of a deduction. As the Tax Court points out: "[Armstrong] would have us conclude that a provision intended to prevent 'step-up' of tax benefits would mandate that a lessee take advantage of an elective tax benefit. We cannot reach that anomalous result." 62 T.C.M. (CCH) at 164. We, too, cannot read Section 168(f)(10) to preclude all limitations on the transferee's ability to use special rules provided for the transferor's deductions.

Thus, the Code does not unambiguously speak to the issue at hand, and it was left to the Secretary to devise regulations reconciling the intention to benefit those taxpayers who actually needed to adjust to the change from a one-year to a five-year deduction for RRB replacement property,

with the intention to ensure that the new ACRS deductions would be made available through safe-harbor leasing to those taxpayers who could use the benefits. Indeed, the Secretary had the express authority under Section 168(f)(8)(G) to "limit the aggregate amount of (and timing of) deductions and credits in respect of qualified leased property to the aggregate amount (and the timing) allowable without regard to this paragraph." The Secretary's contemporaneous accommodation of these two policies in the 1981 regulations is thus entitled to great weight and must not be overturned unless the regulations are found to be either arbitrary, capricious, or manifestly contrary to the Code.

As shown above, neither Section 168(f)(3) nor Section 168(f)(10) clearly precludes a limitation on the transferability of the phase-in privilege. Moreover, the interaction of Section 168(f)(3) and Section 168(g) suggests that the privilege is restricted. Furthermore, we find no support for Armstrong's argument that the restriction in the 1981 regulations directly conflicts with the policy of promoting the transfer of ACRS deductions. The regulations do not prevent the safe-harbor leasing of track replacement property; they merely require the lessor to do what Armstrong in fact did—depreciate the purchased tax benefit over a five-year period.[31] The parties merely needed to make an adjustment in the compensation for the tax benefit transfer. Thus, this very case demonstrates that the regulations did not impede safe-harbor leasing. Where the safe-harbor lessor has "purchased" replacement property but has never used the RRB method, it does not need a special exception to the

---

168(f)(3)(B) as "replacement track material ... installed by a railroad." However, while Section 168(f)(3) appears to apply to any taxpayer, this section must be read in conjunction with the general definition of "RRB property" found in Section 168(g), for the definition in Section 168(f)(3)(B) fails to explain the meaning of "RRB."

**29.** Although Armstrong argues to the contrary, Section 168(g) is clearly a "definitional" subsection which applies to the entire text of Section 168.

**30.** Section 168(f)(10) is not part of the safe-harbor leasing provisions.

**31.** However, the Commissioner notes in his brief that he is "advised that taxpayer's 1982–1985 years have been held in abeyance pending the outcome of this case, and that, therefore, this issue involves only the proper timing of taxpayer's depreciation deduction(s) for the RRB replacement property." Brief at 43 n. 13.

new ACRS for transition purposes, and thus we agree with the Tax Court that the 1981 regulations are a reasonable interpretation and adaptation of Congressional intent.

In addition, the 1986 regulation constitutes a reasonable interpretation of Section 168(f)(3). Congress presumably [32] intended Section 168(f)(3) to alleviate the difficulty caused by the abrupt shift from a one-year to a five-year depreciation period. The 1986 regulation merely clarified that Congress did not intend to offer the special relief of Section 168(f)(3) to those who did not suffer such hardship. Comments accompanying the 1986 regulation explain as follows:

> In repealing the RRB method of depreciation, Congress generally intended that all property placed in service after December 31, 1980, would be subject to the ACRS. This special transitional rule [section 168(f)(3)] for RRB replacement property placed in service before January 1, 1985, was intended to apply only in the case of property that would have been expensed had the RRB method not been repealed. Allowing transitional relief to taxpayers who did not use the RRB method of depreciation prior to January 1, 1981, would thus thwart Congressional intent.

T.D. 8116, 1987–1 C.B. 90, 91.

Armstrong has not presented any convincing argument that the 1981 and 1986 regulations are unreasonable, arbitrary, capricious, or contrary to the plain language of the Code. On the contrary, the regulations appear to accommodate two slightly conflicting goals in a just and permissible manner. We must therefore defer to the wisdom of the Secretary and accordingly we concur with the Tax Court's judgment on this matter. Armstrong is not entitled to the $20 million tax refund, for Section 168(f)(3) does not apply in this case.

## IV.

### CONCLUSION

We will affirm the Tax Court's decision entered on October 29, 1991, which declared a deficiency in Armstrong's 1981 federal income taxes in the amount of $5,032,135 and which rejected its claim for a $20 million refund for that year.

---

**32.** The intent behind Section 168(f)(3) was not made explicit in the Code's legislative history.